UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

Derek J. Baker, Esquire (1998001688)
Brian M. Schenker, Esquire (014582008)
Lauren S. Zabel, Esquire (012132010)
REED SMITH LLP
506 Carnegie Center, Suite 300
Princeton, New Jersey 08540
Telephone:  609-987-0050
Fax:  609-951-0824
dbaker@reedsmith.com
bschenker@reedsmith.com
lzabel@reedsmith.com

*Counsel for BEB Bergen Ave, LLC*

**Forman Holt**
365 West Passaic Street
Suite 400
Rochelle Park, NJ 07662
Telephone: (201) 857-7110
Facsimile: (201) 665-6650
Charles M. Forman, Esq. (CMF-8937)
Michael E. Holt, Esq. (MEH-8735)

*Counsel for Supor Properties Bergen Avenue LLC*

**K&L Gates LLP**
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel M. Eliades, Esq. (DME-6203)
David S. Catuogno, Esq. (DSC-1397)
Caitlin C. Conklin, Esq. (CCC-5117)

*Counsel for Joseph Supor III*

| | |
|---|---|
| In re: | Chapter 11 |
| SUPOR PROPERTIES BERGEN AVENUE, LLC | Case No. 23-15758-SLM |
| Debtor | |

**PROPOSED THIRD AMENDED JOINT PLAN OF REORGANIZATION OR
LIQUIDATION
(Dated January 29, 2024)**

COMES NOW (i) BEB Bergen Ave, LLC, a New York limited liability company, the
secured creditor in the above-captioned and numbered case ("<u>BEB Bergen</u>"), (ii) Supor Properties
Bergen Avenue LLC, a Delaware limited liability company, the debtor out of possession in the
above-captioned and numbered case ("<u>Debtor</u>"), and (iii) Joseph Supor, III ("<u>Mr. Supor</u>") and
propose this Plan of Reorganization or Liquidation (this "<u>Plan</u>") pursuant to Title 11 of the United
States Code, 11 U.S.C. §§ 101 *et seq.*  In such capacity, BEB Bergen, the Debtor, and Mr. Supor
are collectively the "<u>Plan Proponents</u>".  This Plan constitutes a proposal to satisfy the debts owing
by the Debtor as of the time this Plan is confirmed by the Court.

With this proposed Plan, parties-in-interest are receiving a Disclosure Statement that has
been approved by the Court as containing adequate information to enable parties-in-interest to
make an informed judgment on whether to accept or reject this Plan.  This Plan should be read in
conjunction with the Disclosure Statement.  The Disclosure Statement provides background
information, analyzes the financial circumstances of the Debtor, and summarizes this Plan.  Once
confirmed, the provisions of this Plan will legally bind the Debtor and its bankruptcy estate and
creditors and other parties-in-interest regardless of whether such persons and entities have filed
claims or have accepted or rejected this Plan.  Parties-in-interest should thoroughly review this
Plan and the Disclosure Statement before determining whether to accept or reject this Plan.

**ARTICLE I
<u>DEFINITIONS</u>**

For purposes of this Plan, the following terms shall have the meanings set forth below or
in the body of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the
Code or the Bankruptcy Rules (each as defined below), shall have the meaning assigned to such
term in the Code or the Bankruptcy Rules.

1.1    "<u>Administrative Claim</u>" means (a) a Claim for an expense of administration of the
Estate arising during the period commencing on the Petition Date and ending on the Effective Date

under Section 503(b) of the Code, which, if allowed, would be entitled to priority under Section 507(a)(2) of the Code, (b) Professional Fees, and (c) any U.S. Trustee Fees due as of the Effective Date.

**1.2** "Administrative Claims Bar Date" means, for Administrative Claims (other than Professional Fees and U.S. Trustee Fees), as applicable, (a) the first Business Day that is thirty (30) days after the Effective Date, pursuant to which Creditors must file a motion requesting payment of any such Administrative Claim, for which notice shall be provided in the Notice of Effective Date; or (b) any earlier date by which Creditors must file a motion requesting payment of any such Administrative Claim, pursuant to a prior order of the Bankruptcy Court.

**1.3** "Administrative Claims Bar Date Order" means, for all Administrative Claims, as applicable, (a) the Confirmation Order or (b) any prior order of the Bankruptcy Court establishing an Administrative Claims Bar Date.

**1.4** "Allowed Amount" means a principal amount of $20,180,000.00, plus the original principal amount of any Plan Funding Advances made by the Secured Creditor after the Termination Date, if any, plus interest thereon at the Interest Rate as provided for in Section 6.2, if any.

**1.5** "Allowed Claim" means, with respect to any Claim (other than an Administrative Claim as set forth below): (a) a Claim against the Estate to the extent that a proof of Claim was timely filed as of the Bar Date or the Rejection Claim Bar Date, as applicable, or tardily filed as to which neither the Debtor, nor the Secured Creditor, nor any another party in interest has objected, but only if such Claim is not a Disputed Claim, (b) a Claim that appears in the Schedules and has not already been paid, but only if such Claim is not a Disputed Claim or superseded by a subsequent corresponding filed proof of Claim, pursuant to Bankruptcy Rule 3003(c)(4), or (c) a Claim that has been allowed, but only to the extent allowed by (i) a Final Order, (ii) under this Plan, or (iii) under any agreements entered into on or prior to the Effective Date (and approved by the Bankruptcy Court) or in connection with this Plan (and approved in accordance with the terms of this Plan) establishing the amount and nature of any Claim. "Allowed Claim" means, with

respect to Administrative Claims (other than Professional Fees and U.S. Trustee Fees), an Administrative Claim for which a motion requesting payment has been filed prior to the Administrative Claims Bar Date in accordance with either Section 503(b) of the Bankruptcy Code or the procedures for filing requests for payment of an Administrative Claim set forth in the Administrative Claims Bar Date Order but only if such Administrative Claim is not a Disputed Claim.

**1.6**    "Allowed Secured Claim" means an Allowed Claim secured by a valid, perfected, and enforceable lien, security interest, or other charge against Property of the Estate that is not subject to avoidance under bankruptcy or non-bankruptcy law, or which is subject to setoff under Section 553 of the Code, to the extent of the value (determined in accordance with Section 506(a) of the Code) of the interest of such Allowed Secured Claim in the Property of the Estate or to the extent of the amount subject to setoff, as the case may be.

**1.7**    "Bankruptcy Court" means the United States Bankruptcy Court for the District of New Jersey or in the event such court ceases to exercise jurisdiction over the Case, such court or adjunct thereof which thereafter exercises jurisdiction over the Case.

**1.8**    "Bankruptcy Rule(s)" means the Federal Rules of Bankruptcy Procedure and any amendments thereof.

**1.9**    "Bar Date" means September 13, 2023, as to Claims arising before the Petition Date held by entities other than Governmental Units, and means January 1, 2024, as to Claims arising before the Petition Date held by Governmental Units, such dates being the last day for timely filing proofs of such Claims.

**1.10**    "Bergen Avenue" or "Debtor Property" means the Property of the Estate located at that certain real property commonly known as 433 Bergen Avenue, Kearny, New Jersey, which real property is legally described on Exhibit "1" hereto.

**1.11**    "Bid Determination Motion" has the meaning set forth in Section 7.3.12(a) of this Plan.

**1.12** "Business Day" means any day that is not a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) in Hudson County, New Jersey.

**1.13** "Case" or "Bankruptcy Case" means the Debtor's bankruptcy case (Case Number 23-15758-SLM) filed in the Bankruptcy Court.

**1.14** "Chapter 11 Trustee" means Andrea Dobin, solely in her capacity as a chapter 11 trustee pursuant to that certain Final Order of the Bankruptcy Court directing the United States Trustee to appoint a Chapter 11 Trustee in the Case (Docket No. 82) and that certain notice entered on November 15, 2023 by the United States Trustee appointing Andrea Dobin as the Chapter 11 Trustee in the Case (Docket No. 85).

**1.15** "Chapter 11 Trustee Professional" means any and all attorneys and other professionals employed or retained by the Chapter 11 Trustee prior to the Effective Date.

**1.16** "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, as defined in Section 101(5) of the Code.

**1.17** "Class" means a class of Claims or Equity Interests as defined in Article IV of this Plan.

**1.18** "Code" means the United States Bankruptcy Code, 11 U.S.C. Section 101, *et seq*., and any amendments thereof.

**1.19** "Confirmation" means entry of the Confirmation Order.

**1.20** "Confirmation Date" means the date of entry of the Confirmation Order on the Bankruptcy Court's docket with the meaning of Bankruptcy Rule 5003.

**1.21** "Confirmation Order" means the order of the Court, as entered, confirming this Plan pursuant to Section 1129 of the Code.

**1.22** "Consent Order" has the meaning set forth in Section 8.2.2 of this Plan.

**1.23** "Creditor" means the holder of a Claim, as defined in Section 101(10) of the Code.

**1.24** "Debt" means liability on a Claim, as defined in Section 101(12) of the Code.

**1.25** "Debtor" means Supor Properties Bergen Avenue LLC, a Delaware limited liability company.

**1.26** "Designated Rent Payments" means the Rent Payments due on February 1, 2024 and March 1, 2024.

**1.27** "Disclosure Statement" means the Third Amended Disclosure Statement in support of the Plan in the form approved by the Bankruptcy Court, as may be amended, modified, or supplemented in accordance with the Code or order of the Bankruptcy Court.

**1.28** "Disputed Claim(s)" means a Claim against the Estate (a) which has been included in the Schedules as disputed, contingent, or unliquidated or (b) which has been objected to by the Debtor, the Secured Creditor, the Chapter 11 Trustee, or the Plan Administrator another party in interest in the form of an objection filed with the Bankruptcy Court and which objection has not been withdrawn or resolved by the entry of a Final Order.

**1.29** "Distribution" means cash or non-cash disbursements made pursuant to the Plan.

**1.30** "Effective Date" means the first Business Day after the fourteenth (14th) day following the entry of the Confirmation Order, provided no order of stay of Confirmation has been entered as of that date; if an order of stay is entered, the "Effective Date" shall mean the next Business Day after the day the order of stay expires or the Confirmation Order becomes a Final Order, whichever comes first.

**1.31** "Equity Interests" means (a) any membership interest or other equity interest in the Debtor and (b) any interest, including but not limited to, any warrant, options, conversion privileges, or contract rights, to purchase or acquire any membership interest or other equity interest in the Debtor at any time. Subject to Section 6.5, the holder of the Equity Interests in the Debtor is Joseph Supor, III.

**1.32** "Equity Option" means a capital infusion or loan by the holder of the Equity Interests in the Debtor.

**1.33** "Estate" means the bankruptcy estate of the Debtor created pursuant to Section 541(a) of the Code.

**1.34**   "<u>Exculpated Party</u>" and "<u>Exculpated Parties</u>" have the meaning set forth in Section 7.3.11(a) of this Plan.

**1.35**   "<u>Executory Contract</u>" means executory contracts and unexpired leases within the meaning of Section 365 of the Code.

**1.36**   "<u>Exit Transaction</u>" means a transaction under either (a) the Sale-Leaseback Option, (b) the Equity Option, or (c) the Refinance Option.

**1.37**   "<u>Exit Transaction Agreement</u>" has the meaning set forth in the definition of Qualifying Bid.

**1.38**   "<u>Exit Transaction Amount</u>" means an amount at least sufficient to pay in full in immediately available funds: (a) all outstanding Allowed Claims, Allowed Administrative Claims, Professional Fees, U.S. Trustee Fees, Allowed Tax Claims, Allowed Priority Claims, Allowed Secured Claims, Allowed Unsecured Claims, and Plan Expenses; (b) if any or all of the Supor Properties are included in the Exit Transaction, any amounts, if any, required to be paid in order to include such Supor Properties in the Exit Transaction as evidenced by written, duly executed repayment agreements, similar documents, or Final Orders of courts of competent jurisdiction; (c) all claims associated with any Exit Transaction; and (d) all fees and expenses of any professionals retained by the Debtor, and any professionals retained by Mr. Supor, in connection with an Exit Transaction or the Case.

**1.39**   "<u>Exit Transaction Closing Date</u>" means the date on which the consummation of a Qualifying Exit Transaction occurs.

**1.40**   "<u>Exit Transaction Deadline</u>" means May 31, 2024.

**1.41**   "<u>Face Amount</u>" means (a) when used in reference to a Disputed Claim, the full stated liquidated amount set forth in the Schedules or, as applicable, claimed by the Creditor holding such Claim in any proof of Claim filed with the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.42**   "<u>Federal Judgment Rate</u>" means the federal judgment interest rate as of the Friday before the Petition Date pursuant to 28 U.S.C. § 1961 (*i.e.* 5.35% per annum).

**1.43**    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

**1.44**    "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction as to which (a) any appeal or petition for rehearing, reconsideration, or certiorari that has been filed timely has been finally determined or dismissed or (b) the relevant time for such appeal or such petition has expired and a notice of appeal or petition has not been filed timely.

**1.45**    "Governmental Unit" has the meaning set forth in Section 101(27) of the Bankruptcy Code.

**1.46**    "Impaired Class" means a Class of Claims whose treatment under the Plan is impaired within the meaning of Section 1124 of the Code.

**1.47**    "Indemnified Party" and "Indemnified Parties" have the meaning set forth in Section 7.3.11(b) of this Plan.

**1.48**    "Insider Claim" means any Claim against the Debtor by an insider as defined in Section 101(31) of the Bankruptcy Code.

**1.49**    "Interest Rate" means a floating rate per annum equal to the greater of (a) the "Prime Rate", as published in the "Money Rates" section of The Wall Street Journal, or its successor, plus four and one-half percent (4.50%) (with changes becoming effective on the same day there is a change in the Prime Rate), and (b) seven and three-quarters percent (7.75%); provided, however, that if after the Termination Date, any Supor Entity files, or has filed against it, a petition for relief under the Bankruptcy Code, and does not consent to the immediate grant of relief from the automatic stay in favor of the Debtor and the Plan Administrator in any such bankruptcy case in order to allow for the enforcement of the Consent Order, the Interest Rate referenced above will be replaced by twenty-four percent (24%) with retroactive effect to the Confirmation Date.  The Interest Rate shall be calculated on the basis of a 360 day year, based on actual days elapsed.

**1.50**    "Lease" means any lease, master lease, sublease or sub-sublease, letting, license, sublicense or sub-sublicense, concession, or other agreement (whether written or oral) pursuant to

which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of Bergen Avenue, and every modification, amendment, or other agreement (whether written or oral) relating to such lease, license, or other agreement entered into in connection with such lease, license, or other agreement, whether in existence before or after the Petition Date.

**1.51** "Losses" has the meaning set forth in Section 7.3.11(a) of this Plan.

**1.52** "Marital Trust" means MARITAL TRUST UNDER THE LAST WILL AND TESTAMENT OF JOSEPH SUPOR, JR. DATED SEPTEMBER 13, 2002, AS AMENDED BY FIRST CODICIL DATED JUNE 14, 2007.

**1.53** "Mr. Supor" means Joseph Supor, III.

**1.54** "Ms. Dobin" has the meaning set forth in Section 7.3.1 of this Plan.

**1.55** "Notice of Effective Date" shall mean the notice filed and served on all parties-in-interest, pursuant to Section 7.12 of this Plan.

**1.56** "Operating Agreement" shall mean that certain Limited Liability Company Agreement of Supor Properties Bergen Avenue LLC.

**1.57** "Person" means any individual, firm, corporation, limited liability company, business enterprise, trust, association, joint venture, partnership, limited partnership, governmental authority, or other entity, whether acting in an individual, fiduciary, or other capacity.

**1.58** "Petition Date" means July 5, 2023, the date upon which the Debtor filed a petition commencing what is now the Case.

**1.59** "Plan" means this Plan as it may be amended, modified, or supplemented in accordance with its terms or order of the Bankruptcy Court.

**1.60** "Plan Accounts" has the meaning set forth in Section 7.3.3 of this Plan.

**1.61** "Plan Administrator" means the individual or entity appointed under Section 7.3.1 of the Plan, including any duly appointed successor.

**1.62** "Plan Assets" means Bergen Avenue and any other Property of the Estate, if any.

**1.63** "Plan Expenses" shall mean (a) all actual and necessary costs and expenses incurred after the Effective Date in connection with the administration of the Plan, (b) all fees and expenses

of the Plan Administrator and the Post-Confirmation Professionals, and (c) any U.S. Trustee Fees due after the Effective Date.

1.64    "Plan Funding Advances" means protective advances made by the Secured Creditor, in its sole and absolute discretion, but only if called for by the express terms of the Plan or if requested to be made the Plan Administrator, and only if the Termination Date has occurred, all of which shall be deemed made under, secured by, and included as part of the Secured Creditor's Allowed Secured Claim without the need of the Secured Creditor to file or amend any proof of Claim.

1.65    "Plan Proponents" has the meaning set forth in the introductory paragraph of this Plan.

1.66    "Post-Confirmation Professional" means any and all attorneys, real estate brokers, and other professionals employed or retained by the Plan Administrator pursuant to the Plan after the Effective Date.  Any and all Post-Confirmation Professionals of the Plan Administrator shall be employed by the Plan Administrator, in its capacity as such, pursuant to this Plan, in its discretion, and shall not be subject to retention by the Bankruptcy Court or the retention and fee application process, provided under, *inter alia*, Sections 327 and 331 of the Code (but rather shall be subject to the provisions of Article IX hereof).

1.67    "Post-Confirmation Service List" means a service list comprised of the names and email addresses for (a) the Secured Creditor, (b) the Debtor, (c) Mr. Supor, (d) the Creditors holding the five (5) largest Claims in Class 3 as of the Effective Date, (e) the Plan Administrator, (f) the Office of the United States Trustee, and (g) any other Creditor or party in interest that files with the Bankruptcy Court a request for post-Confirmation notice after the Effective Date and serves it on all parties on the Post-Confirmation Service List; provided, however, that any Creditor or party in interest may be removed from the Post-Confirmation Service List with their consent or by order of the Bankruptcy Court on notice to the then-constituted Post-Confirmation Service List upon a showing that such Creditor or such party no longer holds a Claim or has an interest in the Case.

**1.68** "Priority Claim" means any Claim entitled to priority in payment under Section 507 of the Code, except for Administrative Claims and Tax Claims.

**1.69** "Proceeds" means all funds received from the monetization of the Plan Assets.

**1.70** "Professional Fees" means all Claims for compensation for services rendered and reimbursement of expenses incurred by Professionals during the period commencing on the Petition Date and ending on the Effective Date.

**1.71** "Professionals" means those attorneys, accountants, and other financial advisors employed by the Estate, pursuant to Sections 327 or 328 of the Code, in the Case and to be compensated for services rendered and reimbursed for expenses incurred, pursuant to Sections 330(a) and 503(b) of the Code, but shall not include Post-Confirmation Professionals.

**1.72** "Property of the Estate" has the meaning provided by Section 541 of the Code.

**1.73** "Pro Rata" means the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, if any) in such Class, unless the Plan provides otherwise.

**1.74** "Qualified Bidder" has the meaning set forth in Section 7.3.12(a) of this Plan.

**1.75** "Qualified Bid Notice" has the meaning set forth in Section 7.3.12(a) of this Plan.

**1.76** "Qualifying Bid" shall mean (a) a written and binding agreement duly executed by a Third Party providing for an Exit Transaction (the "Exit Transaction Agreement"); (b) the cash consideration under the Exit Transaction Agreement shall be in an amount sufficient to provide for payment in full in immediately available funds of the Exit Transaction Amount; (c) the Exit Transaction Agreement shall have an outside closing date of not later than the Exit Transaction Deadline; (d) the counterparty's commitment to close under the Exit Transaction Agreement must be irrevocable and not contingent on the occurrence or non-occurrence, or existence or non-existence, of (i) the counterparty obtaining financing or obtaining internal approvals; (ii) the outcome or review of due diligence; (iii) the concurrent closing of other transactions by the counterparty or any other Person; (iv) the consent, approval, or acceptance of any proposed tenant under the Sale-Leaseback Option or any other Third Party to the Exit Transaction Agreement, any

agreement, instrument, or document required to be entered into by any such Person pursuant thereto, or any terms, conditions, or provisions thereof; or (v) subject to a Bid Determination Motion, any other condition, fact, or circumstance that the Plan Administrator, in consultation with the Plan Proponents, determines in an exercise of its commercially reasonable discretion, materially and adversely affects the likelihood of the proposed Exit Transaction closing by the Exit Transaction Deadline; (e) the counterparty under the Exit Transaction Agreement must be identified, together with its direct and indirect equity owners, in order to verify such Person's status as an independent Third Party; (f) the Exit Transaction Agreement must be accompanied with written evidence of good funds or sufficient assets, and/or an irrevocable and unconditional commitment for financing, establishing the conclusive ability of the counterparty to fund and consummate the Exit Transaction under the Exit Transaction Agreement on or before the outside closing date thereunder; (g) the Exit Transaction Agreement may not request, be conditioned on, or otherwise entitle the purchaser to any break-up fee, expense reimbursement, or similar type of payment; (h) the Exit Transaction Agreement shall waive any right the purchaser may have to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of the Exit Transaction Agreement; and (i)(A) in the case of an Exit Transaction under the Sale-Leaseback Option, the Exit Transaction Agreement must be accompanied by a deposit of immediately available funds in an amount equal to not less than five percent (5%) of consideration to be paid under the Exit Transaction Agreement and (B) in the case of an Exit Transaction under the Equity Option or the Refinance Option, the Exit Transaction Agreement must be accompanied by a deposit of immediately available funds in an amount equal to not less than $250,000.00, unless, subject to a Bid Determination Motion, the Plan Administrator, in consultation with the Plan Proponents, determines in an exercise of its commercially reasonable discretion, that such a deposit is not necessary for such Exit Transaction, which deposit, in either case, (1) shall be non-refundable to the Person making such deposit, except for customary, market, and commercially reasonable exceptions thereto provided for by the terms, conditions, and provisions Exit Transaction Agreement and (2) shall be otherwise fully and unconditionally payable to and

retainable by the Plan Administrator in the event that the closing under the Exit Transaction Agreement does not occur by the Exit Transaction Deadline.

    **1.77**    "Qualifying Bid Deadline" means April 1, 2024.

    **1.78**    "Qualifying Exit Transaction" means an Exit Transaction set forth in a Qualifying Bid summited on or before the Qualifying Bid Deadline.

    **1.79**    "Refinance Option" means a refinance of Bergen Avenue or Bergen Avenue and one or more of the Supor Properties.

    **1.80**    "Rent Payment" means a monthly payment of $90,000.00 in immediately available funds.

    **1.81**    "Rejected Contract(s)" means those Executory Contracts which are rejected by the Estate pursuant to Sections 365 or 1123(b)(2) of the Code.

    **1.82**    "Rejection Claim" means any Claim under Section 502(g) of the Code that arises under Section 365(g)(1) of the Code in favor of the Third Party to any Executory Contract that is a Rejected Contract.

    **1.83**    "Rejection Claim Bar Date" means, for Rejection Claims, the earlier of (a) the first Business Day that is thirty (30) days after the Effective Date, pursuant to which Creditors must file a proof of any Rejection Claims, for which notice shall be provided in the Notice of Effective Date or (b) such other date established by the Bankruptcy Court by which Third Parties asserting a Rejection Claim must have filed a proof of Claim.

    **1.84**    "Sale/Bidding Procedures Motion" has the meaning set forth in Section 7.3.12(b) of this Plan.

    **1.85**    "Sale Deadline" means July 31, 2024.

    **1.86**    "Sale-Leaseback Option" means a sale and leaseback of Bergen Avenue or Bergen Avenue and one or more of the Supor Properties.

    **1.87**    "Schedules" means the schedules of assets and liabilities, schedules of executory contracts, and the statement of financial affairs initially filed by the Debtor with the Bankruptcy

Court pursuant to Section 521 of the Code and Bankruptcy Rule 1007, as amended and supplemented from time to time.

1.88    "Secured Claim" means a Claim secured by a lien, security interest, or other charge against or interest in collateral, or that is subject to setoff under Section 553 of the Code, to the extent of the value of the interest of the holder of such Claim in the Debtor's interest in such property, or to the extent of the amount subject to setoff, as the case may be.

1.89    "Secured Creditor" or "BEB Bergen" means BEB Bergen Ave, LLC, a New York limited liability company, as assignee of BEB Credit Group II, LLC, a New York limited liability company.

1.90    "Secured Creditor's Allowed Secured Claim" means the Allowed Secured Claim of the Secured Creditor in the total amount of the Allowed Amount.

1.91    "Secured Creditor Loan Documents" means the loan documents attached and/or referred to in the proof of Claim filed by the Secured Creditor.

1.92    "Secured Creditor Pledge Agreement" means that certain Pledge Agreement, dated as of August 4, 2021, made by the Marital Trust for the benefit of Secured Creditor.

1.93    "Share Certificate" means that certain Certificate for Membership Interest, Certificate #001, dated July 26, 2021.

1.94    "Supor Entities" means, collectively, any affiliate of the Debtor and/or any affiliate of the holder of Equity Interests in the Debtor, which as of the Effective Date had, asserted to have, or could have asserted to have a Lease of premises at Bergen Avenue, including, without limitation, J. Supor & Son Trucking & Rigging Co., Inc., J. Supor & Son Trucking & Rigging Co., Supor Trucking LLC, Supor Crane & Rigging LLC, and J. Supor Realty LLC.  It is the intention of the Plan Proponents that "Supor Entities" encompass all affiliated Tenants under Leases or purported Leases of premises at Bergen Avenue in existence as of the Effective Date.

1.95    "Supor OpCo Tenants" means the Supor Entities that are Tenants under the Specified Leases.

**1.96**    "Supor Properties" means (i) real property commonly known as 1-15 Railroad Avenue, Harrison, New Jersey; (ii) real property commonly known as 95 Fulton Street, Boonton, New Jersey; (iii) real property commonly known as 12 Breiderhoft Road, Kearny, New Jersey; and (iv) real property commonly known as 201 Devon Terrace, Kearny, New Jersey.

**1.97**    "Specified Leases" or "Supor OpCo Leases" means, collectively, (i) that certain Commercial Lease Agreement, dated January 1, 2022, entered into by the Debtor, leasing premises at Bergen Avenue referred to as Unit 1; (ii) that certain Commercial Lease Agreement, dated January 1, 2022, entered into by the Debtor, leasing premises at Bergen Avenue referred to as Unit 2; (iii) that certain Commercial Lease Agreement, dated January 1, 2022, entered into by the Debtor, leasing premises at Bergen Avenue referred to as Unit 3; and (iv) that certain Commercial Lease Agreement, dated January 1, 2022, entered into by the Debtor, leasing premises at Bergen Avenue referred to as Unit 4.

**1.98**    "Tax Claim" means a Claim entitled to priority treatment pursuant to Section 507(a)(8) of the Code.

**1.99**    "Tenant" means a Person counterparty to a Lease entered into with the Debtor.

**1.100**    "Termination Date" means the earliest to occur of (a) the Qualifying Bid Deadline, if, on such date, the Debtor and Mr. Supor have not submitted a Qualifying Bid; (b) the Exit Transaction Deadline, if the Debtor and/or Mr. Supor submitted a Qualifying Bid by the Qualifying Bid Deadline but the consummation of the Exit Transaction under such Qualifying Bid fails to occur by the Exit Transaction Deadline at no fault of the Plan Administrator; and (c) the failure of the Plan Administrator to receive payment in immediately available funds of any Rent Payment as and when the same is due and payable under this Plan.

**1.101**    "Third Party" means any Person that is not the Debtor.

**1.102**    "Transfer Requirement" has the meaning set forth in Section 8.2.1 of this Plan.

**1.103**    "Unimpaired Class" means a Class of Claims which is unimpaired under the Plan within the meaning of Section 1124 of the Code.

**1.104** "<u>Unsecured Claim</u>" means a Claim that is not a Secured Claim, Priority Claim, Tax Claim, or Administrative Claim.

**1.105** "<u>U.S. Trustee Fees</u>" means any and all fees and charges due to the United States Trustee pursuant to 28 U.S.C. § 1930.

**1.106** "<u>Winning Bid</u>" has the meaning set forth in Section 7.3.12(b) of this Plan.

**ARTICLE II**
**<u>GENERAL TERMS AND CONDITIONS</u>**

The following general terms and conditions apply to this Plan.  Pursuant to Section 1123 of the Code, Article IV of the Plan designates Classes of Claims and Equity Interests.  As set forth below, and in accordance with Section 1123(a)(1) of the Code, Administrative Claims, Tax Claims, and other Priority Claims have not been classified and are excluded from the Classes set forth in Article IV of this Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim or an Allowed Secured Claim in that Class.  Except to the extent otherwise provided by the Plan, multiple Claims of a Creditor which qualify for inclusion within the same Class shall be deemed aggregated and, if allowed, shall constitute a single Allowed Claim.

**ARTICLE III**
**<u>ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS</u>**

**3.1      Treatment of Administrative Claims**

The holders of Allowed Administrative Claims (other than Professional Fees and U.S. Trustee Fees) shall receive, on account of such Allowed Administrative Claims, cash in the amount of such Allowed Administrative Claims as soon as practicable after the date on which such Administrative Claim becomes an Allowed Administrative Claim or on the Effective Date, whichever is later, unless different treatment is agreed to by the holder of such Allowed

Administrative Claim.  All such payments shall be made from proceeds of, first, Property of the Estate and, thereafter only if necessary, Plan Funding Advances.  Except as may be expressly set forth in the Plan or an order of the Bankruptcy Court, no holder of such an Administrative Claim shall be entitled to payment on account of any post-petition interest or penalties arising with respect to such Administrative Claim.  In the event that a holder of such an Allowed Administrative Claim agrees to be paid such Allowed Administrative Claim on a date later than the date for payment provided by this Section 3.1 of the Plan, its Allowed Administrative Claim shall accrue and be paid simple interest at the Federal Judgment Rate.

3.2     **Administrative Claims Bar Date**

All motions requesting payment of Administrative Claims (other than Professional Fees and U.S. Trustee Fees) must be filed on or before the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Estate and from sharing in any Distribution under the Plan.

3.3     **Treatment of Professional Fees**

Professionals shall receive cash in the amount of the Professional Fees allowed and awarded by the Bankruptcy Court to such Professionals, pursuant to Sections 330(a) and 503(b) of the Code, upon the latter of (a) the Effective Date or (b) as soon as practicable after a Final Order is entered by the Bankruptcy Court approving such Professional Fees, unless any such Professional consents to other treatment.  All such payments shall be made (a) first, from any retainers held by such Professionals and (b) thereafter, from proceeds of, first, Property of the Estate and, thereafter only if necessary, Plan Funding Advances.

3.4     **U.S. Trustee Fees**

All U.S. Trustee Fees payable through the Effective Date shall be paid in full on the Effective Date.  All such payments shall be made from proceeds of, first, Property of the Estate and, thereafter only if necessary, Plan Funding Advances.

3.5     **Holders of Allowed Priority Tax Claims**

- 17 -

Holders of Tax Claims that are Allowed Claims, if any, will be paid on account of such Claims either in accordance with Section 1129(a)(9)(C) of the Code or in full in cash as soon as practicable after the date on which such Tax Claim becomes an Allowed Claim or on the Effective Date, whichever is later, unless different treatment is agreed to by the holder of such Tax Claim. Payment of Tax Claims that are Allowed Claims shall include interest at the rate applicable under non-bankruptcy law. All such payments shall be made from proceeds of, first, Property of the Estate and, thereafter only if necessary, Plan Funding Advances.

**3.6    Holders of Other Unclassified Claims**

The Plan Proponents are unaware of any other unclassified Claims of Persons who may be entitled to an Administrative Claim, a Tax Claim, or a Priority Claim. If there are any unknown Administrative Claims, Tax Claims, or Priority Claims that become Allowed Claims, then they will receive the same treatment as provided above in this Article, as appropriate to the type of each Claim.

**ARTICLE IV**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

Claims and Equity Interests under the Plan are classified as follows:

**4.1    Class 1—Secured Claim of Governmental Unit**

Class 1 consists of the Secured Claim of the Town of Kearny, New Jersey and/or Governmental Units for unpaid real property taxes or municipal assessments assessed against Bergen Avenue. The Secured Claim in Class 1 shall be an Allowed Secured Claim.

**4.2    Class 2—Secured Claim of Secured Creditor**

Class 2 consists of the Secured Claim of the Secured Creditor (except any portion of such Secured Claim which is an Unsecured Claim pursuant to Section 506 of the Code, which is treated in Class 3). The Secured Claim of the Secured Creditor shall be an Allowed Secured Claim in the Allowed Amount.

**4.3    Class 3—General Unsecured Claims**

Class 3 consists of general Unsecured Claims (except those treated in Class 4), any portions of the Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, and any Rejection Claims (except those treated in Class 4). This Class includes any and all Claims not more particularly described in this Plan. Any Unsecured Claim of the Secured Creditor shall be an Allowed Unsecured Claim.

### 4.4    Class 4—Insider Claims

Class 4 consists of Insider Claims that are held by insiders of the Debtor.

### 4.5    Class 5—Equity Interests

Class 5 consists of the Equity Interests in the Debtor.

## ARTICLE V
## <u>IMPAIRMENT OF CLAIMS</u>

The following Classes are Unimpaired Classes: Class 1.

The following Classes are Impaired Classes: Class 2, Class 3, Class 4, and Class 5. Holders of Claims in Impaired Classes should review this Plan carefully to determine the exact treatment of such Claim under this Plan.

If any Impaired Class fails to accept the Plan in accordance with Section 1129(a)(8) of the Code, the Plan Proponent hereby requests confirmation of the Plan pursuant to Section 1129(b) of the Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the holders of Claims in Class 2, Class 3, Class 4, and Class 5.

## ARTICLE VI
## <u>TREATMENT OF CLAIMS AND INTERESTS</u>

Each Class of Allowed Claims and Equity Interests shall be treated as follows:

### 6.1    Class 1—Secured Claim of Governmental Unit

The Creditor holding the Allowed Secured Claim in Class 1 will be paid, in full satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Secured Claim, (a) if such Creditor votes in favor of the Plan, in full as soon as practicable after the Effective Date from the Proceeds of an Exit Transaction or other transaction with respect to the Plan Assets securing such

Claim; or (b) if such Creditor does not vote in favor of the Plan, regular installment payments satisfying the requirements of Section 1129(a)(9)(D) of the Code to be paid from proceeds of, first, Property of the Estate and, thereafter only if necessary, Plan Funding Advances.  The Allowed Secured Claim in Class 1 is secured by Bergen Avenue.  The Creditor in Class 1 shall retain its interest in its collateral until paid in full.

### 6.2    Class 2—Secured Claim of Secured Creditor

The Secured Claim of the Secured Creditor shall be an Allowed Secured Claim in the Allowed Amount. The Secured Creditor holding the Allowed Secured Claim in Class 2 will be paid, in full satisfaction, settlement, and release of and in exchange for such Allowed Secured Claim, immediately available funds in an aggregate amount equal to the Allowed Amount from the Proceeds of an Exit Transaction or other transaction with respect to the Plan Assets securing such Claim.  The Secured Creditor's Allowed Secured Claim in Class 2 shall be secured by Bergen Avenue and all other Plan Assets.  The Secured Creditor shall retain its interest in its collateral until paid in full.

Upon receipt of any Designated Rent Payments, the Plan Administrator shall turnover the same (without any deduction or withholding) to the Secured Creditor for application to and against the Secured Creditor's Allowed Secured Claim.

Upon and following the Termination Date or, if applicable, the Confirmation Date, the aggregate outstanding principal amount of Secured Creditor's Allowed Secured Claim will bear interest at the Interest Rate.

Upon repayment in full of the Secured Creditor's Allowed Secured Claim, at its sole cost and expense, the Secured Creditor shall file (or cause to be filed) with the appropriate governmental authorities such UCC-3 termination statements, control agreement termination notices, lien releases, mortgage releases, cancellations, satisfactions, re-assignments, and other similar discharge or release documents (if applicable, in recordable form) reasonably necessary to evidence or effect of record the termination and release of the security interests and other liens

granted to the Secured Creditor under the Secured Creditor Loan Documents against the Plan Assets.

### 6.3    Class 3—General Unsecured Claims

After the payment in full of Allowed Secured Claims in Classes 1 and 2, Allowed Claims in Class 3 shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, Pro Rata Distributions up to the full amount their Allowed Claims, plus interest at the greater of (a) any contract rate of interest applicable to such Allowed Claim, plus attorney's fees and costs incurred and reimbursable pursuant any contractual agreements applicable to such Allowed Claim, or (b) the Federal Judgment Rate; provided, however, that any portion of the Secured Creditor's Allowed Secured Claim which is an Unsecured Claim pursuant to Section 506 of the Code shall be an Allowed Unsecured Claim, will bear interest at the Interest Rate, and will not be deemed satisfied, settled, or released until repaid in full in immediately available funds.  In the event that the Secured Creditor has an Allowed Unsecured Claim, the Secured Creditor is retaining, and shall have, all of its rights and remedies against Mr. Supor under the Secured Creditor Loan Documents with respect to such Allowed Unsecured Claim, including, without limitation, under the Secured Creditor Pledge Agreement, that certain Non-Recourse Carve-Out Guaranty, dated as of August 2, 2021, executed by Mr. Supor in favor of the Secured Creditor, and that certain Environmental Indemnity Agreement, dated as of August 2, 2021, executed by, *inter alia*, Mr. Supor in favor of Secured Creditor, subject to any defenses of Mr. Supor, if any.  Such Pro Rata Distributions shall be made:

(i)      on the later of: (A) a date within ten (10) days after such Claim becomes Allowed by Final Order; or (B) from the Proceeds of an Exit Transaction or other transaction with respect to the Plan Assets upon closing of the applicable transaction; or

(ii)      upon such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Allowed Class 3 Claim and the Plan Administrator.

### 6.4    Class 4—Insider Claims

After the payment in full of Allowed Secured Claims in Classes 1 and 2 and Allowed Claims in Class 3, Allowed Claims in Class 4 shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Class 4 Claim, Pro Rata Distributions up to the full amount their Allowed Claims, plus simple interest at the Federal Judgment Rate.  Such Pro Rata Distributions shall be made:

(i)      on the later of: (A) a date within ten (10) days after such Claim becomes Allowed by Final Order; or (B) from the Proceeds of an Exit Transaction or other transaction with respect to the Plan Assets upon closing of the applicable transaction; or

(ii)      upon such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Allowed Class 4 Claim and the Plan Administrator.

**6.5      Class 5—Equity Interests**

As of the Effective Date, Mr. Supor shall be deemed to be the owner of one hundred percent (100%) of the Equity Interests in the Debtor, as presently evidenced by the Share Certificate, subject to the terms, conditions, and provisions of the Secured Creditor Pledge Agreement, and Secured Creditor is retaining, and shall have, all of its rights and remedies under of the Secured Creditor Pledge Agreement; provided that, on or before the Effective Date, Mr. Supor shall have duly executed and delivered to Secured Creditor an original replacement share certificate, together with an assignment thereof endorsed in blank, evidencing one hundred percent (100%) of the Equity Interests in the Debtor; provided further, however, that Secured Creditor shall forbear from exercising any rights or remedies under the Secured Creditor Pledge Agreement until after the occurrence of the Sale Deadline.  Subject to the foregoing terms and conditions, holders of Equity Interests in the Debtor shall retain their Equity Interests; provided, further, however, that, effective as of the Effective Date, the Operating Agreement of the Debtor shall be deemed amended as follows:

(i)      the Independent Manager (as defined in the Operating Agreement) shall be terminated and the role of Independent Manager shall be eliminated; and

(ii)     Section 9 of the Operating Agreement of the Debtor shall be deemed amended by adding a new subsection (e) thereto as follows with all capitalized terms used therein that are not defined in the Operating Agreement having the meaning given to such terms in this Plan:

(e)     <u>Effect of Plan</u>.

(i)     <u>Manager</u>.  From the Effective Date to the date of entry of a Final Decree, the business and affairs of the Company shall be managed by and under the direction of the Plan Administrator, as manager.

(ii)     <u>Powers</u>. The Plan Administrator, as manager, shall have the power to do any and all acts necessary, convenient, or incidental to or for the furtherance of the purposes described herein or in the Plan, including, without limitation, all powers, statutory, or otherwise. The Plan Administrator, as manager, has the authority to bind the Company.

(iii)     <u>Manager as Agent</u>. To the extent of its powers as set forth in this Agreement and/or in the Plan, the Plan Administrator, as manager, is an agent of the Company for the purpose of the Company's business, and the actions of the Plan Administrator, as manager, taken in accordance with such powers set forth in this Agreement and/or in the Plan shall bind the Company.

(iv)     <u>Duration</u>.  This Section 9(e) shall remain effective until the earlier of (A) such time as there is no longer any Plan Administrator appointed pursuant to the terms, conditions, and provisions of the Plan; or (B) the date of entry of a Final Decree, at which time this Section 9(e) shall be deemed deleted, null, and void.

After the payment in full of (a) in the case of an Exit Transaction, the Exit Transaction Amount and (b) in the case of any other transaction with respect to the Plan Assets, outstanding Allowed Claims, Allowed Administrative Claims, Professional Fees, U.S. Trustee Fees, Allowed Tax Claims, Allowed Priority Claims, Allowed Secured Claims, Allowed Unsecured Claims, and Plan Expenses, holders of Equity Interests in the Debtor shall receive any remaining Proceeds

from, as the case may be, such Exit Transaction or such other transaction with respect to the Plan Assets.

Upon repayment in full of the Allowed Claim of the Secured Creditor, at its sole cost and expense, the Secured Creditor shall (i) file (or cause to be filed) with the appropriate governmental authorities such UCC-3 termination statements, control agreement termination notices, lien releases, mortgage releases, cancellations, satisfactions, re-assignments, and other similar discharge or release documents (if applicable, in recordable form) reasonably necessary to evidence or effect of record the termination and release of the security interests and other liens granted to the Secured Creditor under the Secured Creditor Pledge Agreement against the Equity Interests in the Debtor; and (ii) release and return to Mr. Supor the original replacement share certificate, together with the assignment thereof, referenced above in this Section 6.5.

## ARTICLE VII
## MEANS FOR EXECUTION OF THE PLAN

The Plan shall be implemented on the Effective Date.  In addition to the provisions set forth elsewhere in this Plan regarding means of execution, the following shall constitute the principal means for implementation of the Plan.

### 7.1    Effective Date Transactions

Without limiting the generality of the foregoing, and without altering or amending the terms of the Plan in any manner, on (or, where appropriate, after) the Effective Date, the following actions shall occur:

(a)    The transactions contemplated under the Plan shall be consummated; and

(b)    The Plan Administrator shall assume its assigned duties and responsibilities under the Plan as set forth herein.

### 7.2    Revesting of Property of the Estate

Subject to the terms, conditions, and provisions of this Plan, the Debtor shall be revested with the Property of the Estate on the Effective Date of the Plan, including but not limited to causes of action against third parties to the extent not expressly released by the Plan.

### 7.3     Plan Administrator

#### 7.3.1    Appointment of Plan Administrator

Pursuant to Section 1142 of the Code, the Plan Administrator is hereby appointed to manage its assigned duties and responsibilities under this Plan and administer all of the Plan Assets and the Proceeds and, subject to the specific provisions of this Plan, shall have the authority to exercise all of the rights and powers of a debtor in possession granted pursuant to Section 1107 of the Code in connection with managing such duties and responsibilities and administering the Plan Assets and the Proceeds.  In addition, the Plan Administrator shall have such other and further authority and powers as are set forth in this Plan and the Confirmation Order, including, without limitation, the authority and power of a manager of the Debtor as set forth in Section 6.5 under otherwise applicable non-bankruptcy law.  Further, the Plan Administrator, to the extent required to perform its duties and responsibilities and administer all of the Plan Assets and the Proceeds, is hereby granted a power of attorney for the Debtor to execute such documents and perform such acts on behalf of the Debtor or the Estate as contemplated by this Plan.

Andrea Dobin ("Ms. Dobin") is hereby appointed as the initial Plan Administrator. The appointment of Ms. Dobin (or any successor to Ms. Dobin) as the Plan Administrator may only be terminated: (a) by or with the consent of the Plan Proponents; (b) "for cause" by order of the Bankruptcy Court, after a motion and a hearing; (c) upon completion of its duties and responsibilities under the Plan and administration of all of the Plan Assets and the Proceeds; or (d) by the Plan Administrator providing thirty (30) days prior written notice of its intention to terminate its appointment to the Creditors and parties in interest on the Post-Confirmation Service List, provided, however, that such a termination pursuant to clause (a), (b), or (d) shall not be effective until a successor Plan Administrator shall have been appointed in accordance with the next sentence of this Section 7.3.1.  In the event of a termination in the appointment of the Plan Administrator, a successor Plan Administrator shall be appointed by: (a) the Secured Creditor, subject to the approval of the Bankruptcy Court; or (b) by order of the Bankruptcy Court, after a motion and a hearing.

- 25 -

### 7.3.2    Duties of Plan Administrator

On and after the Effective Date, the Plan Administrator shall be responsible for implementation of the Plan and the administration of the Plan Assets and the Proceeds.  In carrying out its duties and responsibilities, the Plan Administrator shall exercise prudent business judgment. Subject to the foregoing, the Plan Administrator shall use commercially reasonable efforts to (a) maximize Proceeds from the Plan Assets in order to implement the Plan; and (b) maintain, preserve, and realize value of the Plan Assets for Creditors holding Allowed Claims and holders of the Equity Interests in the Debtor.  To the extent practicable, the Plan Administrator shall maintain books and records related to the Plan Assets, the Proceeds, and the Distributions made under the Plan pursuant to the Plan.

### 7.3.3    Specific Powers and Authority of Plan Administrator

The Plan Administrator shall be specifically empowered and authorized to do the following on behalf of the Debtor or, as applicable, the Estate:

(a)    Manage the business, affairs, and properties of the Debtor;

(b)    Take custody, possession, and control of the Plan Assets to the exclusion of all other Persons;

(c)    Market the Plan Assets for sale and/or Lease;

(d)    Execute, enter into, and perform contracts, agreements, and other documents of all kinds related to the sale or Lease of the Plan Assets, provided that the Plan Administrator shall not enter into any Lease of Bergen Avenue without the prior written consent of the Secured Creditor;

(e)    Employ or retain Post-Confirmation Professionals of the Plan Administrator;

(f)    Purchase property, liability, flood, and other commercially reasonable insurance to protect the Plan Assets;

(g)    Open, maintain, manage, and close deposit accounts related to the Plan Assets and their Proceeds in the name of Estate or in the name of the Plan

Administrator, in its capacity as such, provided that the Plan Administrator shall maintain control of such accounts ("Plan Accounts");

(h)     Incur and pay or reimburse Plan Expenses related to the Plan Assets, the administration thereof by the Plan Administrator, or the Plan Administrator performing its duties and responsibilities under the Plan, as provided for in the Plan;

(i)     Bring and defend objections to Claims; provided, however, that the Plan Administrator will not object to Unsecured Claims unless and until it is apparent that there will be a Distribution on account of Unsecured Claims;

(j)     Make or cause to be made Distributions to Allowed Claims, pursuant to the other terms of the Plan;

(k)     Bring and defend actions in law or at equity on behalf of the Debtor or, as applicable, the Estate in the Bankruptcy Court or any other court, including, without limitation, (i) actions related to the Plan Assets or the Proceeds and (iii) actions to obtain judgments for possession and warrants of removal in respect of Bergen Avenue and, in connection therewith, relief from any applicable stay;

(l)     Issue releases on behalf of the Debtor and the Estate without the requirement of complying with Bankruptcy Rule 9019; and

(m)     Do and perform all other acts as may be necessary or appropriate to performance of the Plan Administrator's duties and responsibilities under the Plan.

### 7.3.4    Information Sharing

The Debtor shall deliver to the Plan Administrator such financial and other information concerning the business and affairs of the Plan Assets as the Plan Administrator shall reasonably request from time to time.  Upon written request from the Plan Administrator, the Debtor shall deliver to the Plan Administrator evidence, satisfactory to the Plan Administrator,

that property, liability, flood, and other commercially reasonable insurance to protect the Plan Assets is being maintained by the Debtor and is in full force and effect and that the Plan Assets are insured by the Debtor for the full replacement value thereof.  The Debtor shall permit the Plan Administrator and any authorized representatives designated by the Plan Administrator (including, without limitation, the Post-Confirmation Professionals of the Plan Administrator) to visit and inspect the offices, tangible assets, intangible assets, and real property assets related to the Plan Assets, and to view and inspect all financial and accounting records, including, without limitation, contracts, and records of legal proceedings, to make copies and take extracts therefrom, and to discuss any of the Plan Assets, and finances and businesses related thereto, with the Debtor shall at such reasonable times during normal business hours and as often as may be reasonably requested.

### 7.3.5   Plan Assets – Cash and Proceeds

On or as soon as practicable after the Effective Date, the Plan Administrator shall establish Plan Accounts, and any Plan Assets consisting of cash shall be transferred to the Plan Accounts.  Thereafter, all cash Proceeds shall be deposited into Plan Accounts.

### 7.3.6   Reporting Requirements

The Plan Administrator shall provide such information as the Secured Creditor may reasonably request to keep itself fully informed of the Plan Administrator's performance of its duties and responsibilities under the Plan.

### 7.3.7   Removal "For Cause"

A party in interest may seek to terminate the Plan Administrator "for cause" by filing a motion with the Bankruptcy Court.  For purposes of the Plan, "for cause" shall mean (a) gross negligence in the performance of the Plan Administrator's duties and responsibilities under the Plan, (b) fraud or willful misconduct in connection with the performance of any of the Plan Administrator's duties and responsibilities under the Plan, or (c) any act or omission that constitutes a material breach of the terms and conditions of the Plan or a violation of the Code or other applicable law.  Upon termination as a Plan Administrator, the former Plan Administrator

shall have no authority regarding the implementation of the Plan or the administration of the Plan Assets, including, without limitation, the management, control, and operation of the Plan Assets, and the Proceeds, which authority shall be vested solely in a successor Plan Administrator appointed pursuant to the terms of the Plan.

### 7.3.8    Plan Expenses on or after the Effective Date

Plan Expenses incurred on and after the Effective Date shall be paid from proceeds of Property of the Estate, including Plan Funding Advances and/or the Proceeds of the Plan Assets.

### 7.3.9 Priority of Payment of the Plan Administrator's Expenses

All fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator shall be paid from the proceeds of Property of the Estate, including Plan Funding Advances and/or the Proceeds of the Plan Assets, and such right to payment shall be prior and superior to any other rights, including, without limitation, rights of the holders of Claims to receive any Distribution of Proceeds of the Plan Assets. To secure the payment of all fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator, the Plan Administrator is granted a first priority security interest in the Proceeds of the Plan Assets, which shall (i) be deemed automatically perfected without the need for any other documents, deposit account control agreements, filings, or otherwise, and (ii) shall not be subordinate to any other lien, Claim, or interest notwithstanding any other provision of this Plan, any order, or any other documents to the contrary. The security interest granted pursuant to this provision shall survive any termination of a Plan Administrator. The rights of any successor Plan Administrator hereunder shall be subordinate to the rights of the initial or preceding Plan Administrators.

### 7.3.10    Compensation for Plan Administrator

The Plan Administrator shall be compensated for services and reimbursed for expenses at the rates and on the terms to which the Secured Creditor and the Plan Administrator have agreed, which rates and terms are appended as Exhibit "2" to the Plan. Changes to such

compensation rates and terms shall be subject to the consent of the Secured Creditor and the approval of the Bankruptcy Court after a motion initiated by the Plan Administrator.  The Plan Administrator shall file a monthly compensation report detailing total compensation and expense reimbursements to be paid to the Plan Administrator for the prior month; provided, however, that the Plan Administrator shall not be required to file detailed time records as part of the report. Parties in interest shall have five (5) Business Days after the filing of any monthly compensation report to object to the same.  Absent any such objection, all compensation and expense reimbursements owed to the Plan Administrator as set forth on such monthly compensation report shall constitute Plan Expenses and shall be paid in accordance with the terms and conditions of the Plan.  In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Plan Administrator with respect to such monthly compensation report by determining whether the fees and expenses are reasonable under the circumstances.

### 7.3.11 Limitations of Liability

(a)      **Exculpation of Chapter 11 Trustee**

Neither the Chapter 11 Trustee, nor any Chapter 11 Trustee Professional retained by the Chapter 11 Trustee (each, an "Exculpated Party" and collectively, the "Exculpated Parties"), shall be liable for any losses, claims, damages, liabilities, obligations, settlements, proceedings, suits, judgments, causes of action, litigation, actions, or investigations (whether civil or administrative and whether sounding in tort, contract, or otherwise), penalties, costs, and expenses, including, without limitation, reasonable fees and disbursements (collectively referred to herein as "Losses"), whether or not in connection with litigation in which any Exculpated Party is a party or enforcing this Plan (including, without limitation, these exculpation provisions), incurred, caused by, relating to, based upon, or arising out of (directly or indirectly) the Chapter 11 Trustee's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties, and obligations in the Case, or as may arise by reason of any action, omission, or error of an Exculpated Party in connection therewith; provided, however, that the foregoing

limitation shall not apply to any Losses suffered or incurred by any holder of a Claim or an Equity Interest that are found in a Final Order by a court of competent jurisdiction to have directly resulted from the fraud, gross negligence, or willful misconduct of such Exculpated Party.

(b)     **Indemnification of Plan Administrator**

The Plan Administrator and any director, officer, affiliate, employee, employer, attorney, professional, and Post-Confirmation Professional retained by the Plan Administrator, successor, assign, agent, or representative of the Plan Administrator (each, an "Indemnified Party"; and collectively, the "Indemnified Parties") shall be defended, held harmless, and indemnified from time to time by the Debtor against any and all Losses, including, without limitation, the reasonable costs for counsel or others in investigating, preparing, defending, or settling any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party or enforcing this Plan (including, without limitation, these indemnity provisions), incurred, caused by, relating to, based upon, or arising out of (directly or indirectly) the Plan Administrator's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties, and obligations under this Plan, or the Confirmation Order, or as may arise by reason of any action, omission, or error of an Indemnified Party in connection therewith; provided, however, such indemnity shall not apply to any such Losses to the extent it is found in a Final Order by a court of competent jurisdiction to have directly resulted from the fraud, gross negligence, or willful misconduct of such Indemnified Party.  Satisfaction of any obligation of the Debtor arising pursuant to the terms of this Section shall be payable only from the assets of the Debtor, such obligations shall be Plan Expenses, and such right to payment shall be prior and superior to any other rights, including, without limitation, rights of Creditors under the Plan to receive a Distribution.   Every act taken or omitted, power exercised, or obligation assumed by the Plan Administrator or any Indemnified Party pursuant to the provisions of this Plan shall be held to be taken or omitted, exercised, or assumed, as the case may be, by the Plan Administrator or any Indemnified Party acting for and on behalf of the Estate and not otherwise; provided, however, that none of the foregoing Persons are deemed to be responsible for any other such

Persons' actions or inactions. Every Person contracting or otherwise dealing with or having any relationship with the Plan Administrator or any other Indemnified Party shall have recourse only to the Debtor for payment of any liabilities or other obligations arising in connection with such contracts, dealings, or relationships, and the Plan Administrator and the other Indemnified Parties shall not be individually liable therefore.  In no event shall the Plan Administrator be liable for indirect, punitive, special, incidental, diminution of value, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Plan Administrator has been informed of the likelihood of such loss or damages and regardless of the form of action.

( c )   **Reliance by Plan Administrator on Documents or Advice of Counsel**

Except as otherwise provided in this Section 7.3.11, the Plan Administrator and any director, officer, affiliate, employee, employer, attorney, Post-Confirmation Professional retained by the Plan Administrator, agent, or representative of the Plan Administrator may rely, and shall be protected from liability for acting or failing to act, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document reasonably believed by the Plan Administrator in good faith to be genuine and to have been presented by an authorized party. Except as otherwise provided in this Section 7.3.11, the Plan Administrator shall not be liable for any action taken or omitted or suffered in reasonable, good faith reliance upon the advice of counsel or another Post-Confirmation Professional retained by the Plan Administrator in accordance with this Plan.  Except as otherwise provided in this Section 7.3.11, the Plan Administrator shall be indemnified by the Debtor for or in respect of any action taken, suffered, or omitted by it and in accordance with such advice or opinion.

### 7.3.12  Monetization of Plan Assets – Duties and Responsibilities

(a)   **Exit Transaction Monetization**

From and including the Confirmation Date through but excluding the Termination Date, the holder of the Equity Interests in the Debtor shall have the exclusive right to market and pursue an Exit Transaction.  During such time-period, the Plan Administrator shall not

market or pursue a sale of or any other transaction with respect to Bergen Avenue but shall provide counsel for the Debtor and Mr. Supor with any offers for an Exit Transaction received by the Plan Administrator. The Exit Transactions are:

(1)     the Sale-Leaseback Option, *e.g.*, the sale of Bergen Avenue, and payment of the entire Exit Transaction Amount, subject to the Supor Op Co Leases, as may be modified by agreement of buyer and the Supor Op Co Tenants, or termination of the Supor Op Co Leases and entry of a lease of the Debtor Property from buyer to the Debtor;

(2)     the Equity Option, *e.g.*, the payment of the entire Exit Transaction Amount from the proceeds of a capital infusion by Mr. Supor to the Debtor or a loan by Mr. Supor to the Debtor; and

(3)     the Refinance Option, *e.g.*, the refinance of the Debtor Property for an amount sufficient to pay the entire Exit Transaction Amount.

From and including the Confirmation Date through but excluding the Termination Date, the Debtor and/or the holder of the Equity Interests in the Debtor may engage a broker(s) in connection with an Exit Transaction.  Any such broker shall be at the choosing of the Debtor and/or the holder of the Equity Interests in the Debtor, in their sole and absolute discretion, and be at the sole cost and expense the holder of the Equity Interests in the Debtor.  Mr. Supor shall be authorized to undertake all action and execute all retention agreements and other documents on behalf of the Debtor reasonably requested by a prospective broker; provided, however, that all such agreements and documents shall expressly provide that, and whether or not it does so expressly provide, any obligations of the Debtor or the Estate thereunder, or rights of the counterparties thereto with respect to the Plan Assets, the Debtor, the Equity Interests in the Debtor, or the Estate, are subject to the terms, conditions, and provisions of the Plan and either (i) written consent, approval, or no objection of the Plan Administrator, which shall not be unreasonably withheld, and the Plan Administrator shall respond to any such request within two (2) Business Days; or (ii) Bankruptcy Court approval.  Any such retention agreement shall expressly provide that such broker may only

- 33 -

receive compensation from the consummation of an Exit Transaction and waive any right to seek compensation from any other transaction with respect to Bergen Avenue absent a separate agreement with the Plan Administrator, including, without limitation, in the scenario where a Person pursued, but failed to consummate an Exit Transaction, and then later consummated a different transaction with respect to Bergen Avenue with the Plan Administrator.  Mr. Supor shall provide counsel for the Plan Administrator and BEB Bergen with a written copy of any broker engagement agreement or other document entered into by Mr. Supor with any broker within five (5) days after the execution thereof.

The Debtor and/or Mr. Supor shall have up to and including the Qualifying Bid Deadline to submit a Qualifying Bid for an Exit Transaction to the Plan Administrator, with a copy to counsel for BEB Bergen (a "Qualified Bid Notice").  From the Confirmation Date through but excluding the Termination Date, Mr. Supor shall be authorized to undertake all actions and execute all documents on behalf of the Debtor and/or the holder of the Equity Interests in the Debtor reasonably requested by a prospective Third Party counterparty to an Exit Transaction (a "Qualified Bidder") or related party regarding a prospective Exit Transaction, including, but not limited to, non-disclosure agreement(s), letter(s) of intent, access agreement(s), and/or loan applications, provided, however, that all such agreements and documents shall expressly provide that, and whether or not it does so expressly provide, any obligations of the Debtor or the Estate thereunder, or rights of the counterparties thereto with respect to the Plan Assets, the Debtor, the Equity Interests in the Debtor, or the Estate, are subject to the terms, conditions, and provisions of the Plan and either (i) written consent, approval, or no objection of the Plan Administrator, which shall not be unreasonably withheld, and the Plan Administrator shall respond to any such request within two (2) Business Days; or (ii) Bankruptcy Court approval.  Mr. Supor shall provide counsel for the Plan Administrator and BEB Bergen with written copies of all documents executed on behalf of the Debtor and/or the holder of the Equity Interests in the Debtor and conveyed to a prospective Qualified Bidder or related party within three (3) days after execution thereof

Notwithstanding anything to the contrary contained herein, except in connection with the consummation of a Qualifying Exit Transaction on the Exit Transaction Closing Date (as provided below), Mr. Supor shall have no authority whatsoever to enter into any Lease of any premises at Bergen Avenue on behalf of the Debtor, and any such purported Lease shall be deemed immediately null, void, ultra vires, and of no effect whatsoever.

If, on or before the Qualifying Bid Deadline, the Plan Administrator, in consultation with the Plan Proponents, determines that the Debtor and/or Mr. Supor have submitted a Qualifying Bid, then (i) the Debtor and/or Mr. Supor shall have until the Exit Transaction Deadline to close the Qualifying Exit Transaction and (ii) may, but are not required to, seek a Bankruptcy Court order approving the Qualifying Exit Transaction pursuant to applicable provisions of the Bankruptcy Code. In such event, through the earlier of the Termination Date and the conclusion of the Exit Transaction Closing Date, Mr. Supor shall be authorized to undertake all actions and execute all documents on behalf of the Debtor and/or the holder of the Equity Interests reasonably requested by a Qualified Bidder or required to consummate the Qualifying Exit Transaction, including, but not limited to, a deed and Lease for the Debtor Property, provided, however, that that any such document shall expressly provide that, and whether or not it does so expressly provide, it shall not be effective until the consummation of the Qualifying Exit Transaction on the Exit Transaction Closing Date, and any obligations of the Debtor or the Estate thereunder, or rights of the counterparties thereto with respect to the Plan Assets, the Debtor, the Equity Interests in the Debtor, or the Estate, are subject to the terms, conditions, and provisions of the Plan and either (i) written consent, approval, or no objection of the Plan Administrator, which shall not be unreasonably withheld, and the Plan Administrator shall respond to any such request within two (2) Business Days; or (ii) Bankruptcy Court approval. Mr. Supor shall provide counsel for the Plan Administrator and BEB Bergen with written copies of all documents executed on behalf of the Debtor and/or the holder of the Equity Interests in the Debtor in connection with the consummation of a Qualifying Exit Transaction within three (3) days after execution thereof and, in any event, at least two (2) Business Days prior to the Exit Transaction Closing Date.

In addition, if, on or before the Qualifying Bid Deadline, the Plan Administrator, in consultation with the Plan Proponents, determines that the Debtor and/or Mr. Supor have submitted a Qualifying Bid, then the Plan Administrator shall execute and covey all documents reasonably requested by the Qualified Bidder or required to consummate the Qualifying Exit Transaction.

Notwithstanding anything to the contrary contained herein, neither the Debtor nor Mr. Supor shall have authority to consummate a Qualifying Exit Transaction without the prior review and written approval of the final settlement statement or flow of funds with respect thereto by the Plan Administrator, which review and approval will be limited to the issues of whether the net Proceeds reflected thereon are sufficient to pay the amount under clause (a) of the definition of Exit Transaction Amount and confirmation that such Proceeds shall be deposited into a Plan Account upon consummation of the Qualifying Exit Transaction. Upon receipt of such Proceeds, the Plan Administrator shall disburse the same as and when set forth in the Plan.

If, on the Qualifying Bid Deadline, the Plan Administrator, in consultation with the Plan Proponents, determines that the Debtor and Mr. Supor have not submitted a Qualifying Bid, then the Plan Administrator shall have the exclusive right to market and pursue a sale or other transaction with respect to the Plan Assets as set forth in Section 7.3.12(b); provided, however, that such right shall be subject to the disposition of any Bid Determination Motion and stayed during the pendency of any such motion.

Within two (2) Business Days after its receipt of a Qualified Bid Notice, the Plan Administrator shall notify the Plan Proponents in writing of the Plan Administrator's determination whether the bid subject to the Qualified Bid Notice is or is not a Qualified Bid submitted by the Qualifying Bid Deadline.

In the event that any Plan Proponent disputes a determination by the Plan Administrator that the Debtor and/or Mr. Supor have or have not submitted a Qualifying Bid by the Qualifying Bid Deadline, within two (2) Business Days of the Qualifying Bid Deadline, such Plan Proponent shall seek an expedited hearing from the Bankruptcy Court on not less than, and not more than, five (5) Business Days prior notice to the parties on the Post-Confirmation Service List of the

proposed hearing date or shall be deemed to have accepted such determination (a "Bid Determination Motion"). In any hearing regarding whether the Debtor and Mr. Supor have or have not submitted a Qualifying Bid by the Qualifying Bid Deadline, unless otherwise ordered by the Bankruptcy Court, the sole and exclusive issue shall be whether the Debtor and Mr. Supor have or have not submitted a Qualifying Bid by the Qualifying Bid Deadline.

(b)  **Plan Administrator Monetization**

Upon and following the occurrence of the Termination Date, with respect to the monetization of the Plan Assets, the Plan Administrator and the Post-Confirmation Professional shall market the Plan Assets for sale and use commercially reasonable efforts to cause a sale of the Plan Assets to be consummated on or before the Sale Deadline. Without limiting the generality of the forgoing, the Plan Administrator may use commercially reasonable sale milestones:

(1)  the Plan Administrator, after consultation with the Secured Creditor, may file and properly serve a motion (the "Sale/Bidding Procedures Motion") seeking the Bankruptcy Court's approval of (i) the sale of all or substantially all of the Plan Assets and (ii) bidding procedures for an auction and sale of all or substantially all of the Plan Assets, pursuant to Sections 363 and 365 of the Bankruptcy Code; provided that Mr. Supor shall have the right to bid provided that he complies with the qualifications for bidders established by the Order approving the Sale/Bidding Procedures Motion;

(2)  the Plan Administrator may hold and complete an auction in accordance with the provisions of the order of the Bankruptcy Court approving the bidding procedures contained in the Sale/Bidding Procedures Motion and may select for approval by the Bankruptcy Court, at a sale hearing to be held prior to the Sale Deadline, the highest and otherwise best bid(s) for the applicable property and

assets made by any bidder(s) at the auction (each such highest and otherwise best bid, a "Winning Bid");

(3)     thereafter, the Plan Administrator may file and properly serve a motion seeking the Bankruptcy Court's approval of the Winning Bid at a sale hearing to be held prior to the Sale Deadline; and

(4)     upon the Bankruptcy Court's approval of the Winning Bid, the Plan Administrator may cause the sale of such Plan Assets to be consummated prior to the Sale Deadline.

**7.4     Sales of Plan Assets**

Upon and following the occurrence of the Termination Date, a Creditor in Class 1 or 2 with an Allowed Secured Claim shall have the right to credit bid up to the amount of its Allowed Secured Claim in connection with any sale of a Plan Asset that constitutes its collateral, provided that such credit bid shall also include a cash portion in the amount necessary, if any, to pay in full (a) all Allowed Secured Claims against the same collateral having priority over such Creditor's Allowed Secured Claim and (b) any Plan Expenses directly related to the consummation of such transaction.  Sales of Plan Assets shall be made pursuant to Section 363 of the Code (including, without limitation, Sections 363(f) and (h)) and shall be brought before the Bankruptcy Court for approval by a motion initiated by the Plan Administrator.  All parties-in-interest shall retain the right to object to any such motion on any bases permitted by the Code or applicable case law.

**7.5     Plan Funding Advances**

All Plan Funding Advances made by the Secured Creditor shall be, and are hereby, secured by perfected liens and security interests in favor of the Secured Creditor on and in the Plan Assets and the Proceeds, subject and subordinate only to (a) existing Allowed Secured Claims against the Plan Assets and the Proceeds and (b) the liens and claims of the Plan Administrator granted pursuant to this Plan.  On the Confirmation Date, the liens and security interests securing any Plan Funding Advances shall be deemed valid, binding, enforceable, and perfected with respect to all of the Plan Assets and the Proceeds.  The Secured Creditor shall not be required to file any UCC-

1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document or take any other action (including, without limitation, possession of or control of any of the Plan Assets or the Proceeds or the obtaining of any consent of any Third Party) in order to validate the perfection of such liens and security interests.  If the Secured Creditor chooses to file or record any such mortgages, deeds of trust, security deeds, notices of lien, or UCC-1 financing statements or take any other action to validate the perfection of any of the liens and security interests securing the Plan Funding Advances, the Debtor and the Plan Administrator are authorized and directed to execute any documents or instruments as the Secured Creditor shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded as of the Confirmation Date.  In addition, although the Secured Creditor's liens and security interests secured the Plan Funding Advances on the Plan Accounts shall be deemed perfected without the need for any further action, the Debtor and the Plan Administrator are authorized and directed to enter into such control agreements with the Secured Creditor and the financial institutions at which the Plan Accounts are located, as the Secured Creditor may reasonably require. The Secured Creditor may, in its discretion, file a certified copy of the Confirmation Order in any filing office in any jurisdiction in which any of the Plan Assets or the Proceeds are deemed to be located, and each filing office is directed to accept such certified copy of the Confirmation Order for filing and recording.  All liens and security interests, and any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document, obtained and provided to the Secured Creditor in connection with the Plan have been issued and delivered pursuant to the Plan. Pursuant to Section 1146 of the Code, such liens and security interests, and any filing or recording of any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document, shall be free from any stamp, transfer, recording, or similar tax.

### 7.6    Distributions and Payments Under the Plan

#### 7.6.1   General Provisions

The Plan Administrator shall make all Distributions and payments due under the Plan on the Effective Date and all other Distributions and payments under the Plan.

### 7.6.2    Distributions and Payments from Plan Assets and Proceeds

After the Effective Date, all cash consisting of Plan Assets and all cash Proceeds shall be deposited into Plan Accounts from which all Distributions and payments to be made by the Plan Administrator under the Plan shall be made by the Plan Administrator as follows:

(a)    **Payment of Plan Expenses**

The Plan Administrator shall pay Plan Expenses in accordance with the other terms and conditions of this Plan and may do so without further order of the Bankruptcy Court.

(b)    **Payment of Disposition Expenses and Allowed Secured Claims**

In connection with Proceeds of any Plan Asset, the Plan Administrator shall first make Distributions to pay disposition expenses with respect to such Proceeds (consisting of reasonable, documented, and customary closing costs related to such Proceeds and U.S. Trustee Fees attributable to such disposition (all of which shall be deemed Plan Expenses)), then shall make Distributions to pay any other unpaid Plan Expenses, then shall make Distributions to pay any Plan Funding Advances secured by such Plan Asset, and then shall make Distributions to pay Allowed Secured Claims in order of their priority on such Plan Asset to the extent of the Proceeds.

(c)    **Payment of Allowed Claims in Class 3**

Only after all Plan Funding Advances and all Allowed Secured Claims in Classes 1 and 2 have been paid in full, the Plan Administrator shall make Distributions to pay Allowed Claims in Class 3 on a Pro Rata basis to the extent of the Proceeds and may do so without further order of the Bankruptcy Court.

(d)    **Payment of Allowed Claims in Class 4**

Only after all Plan Funding Advances, all Allowed Secured Claims in Classes 1 and 2, and all Allowed Claims in Class 3 have been paid in full, the Plan Administrator

shall make Distributions to pay Allowed Claims in Class 4 on a Pro Rata basis to the extent of the Proceeds and may do so without further order of the Bankruptcy Court.

(e)     **Payments of on Account of Equity Interests in Class 5**

Only after all Plan Funding Advances, all Allowed Secured Claims in Classes 1 and 2, and all Allowed Claims in Classes 3 and 4 have been paid in full, the Plan Administrator shall make Distributions on account of Equity Interests in Class 5 on a Pro Rata basis to the extent of the Proceeds and may do so without further order of the Bankruptcy Court.

### 7.6.3    Distribution Addresses

Unless a Creditor has provided the Plan Administrator with written notice of a different address, Distributions will be sent to Creditors at their addresses as set forth in their proofs of Claim filed with the Bankruptcy Court.  If no proof of Claim is filed with respect to a particular Claim, Distributions on account of such Claim will be mailed to the applicable Creditor at its address as set forth in the Schedules.  Distributions on account of Equity Interests will be mailed to the applicable holder thereof at its address as set forth in the Schedules or as otherwise directed by Mr. Supor or his counsel by written notice to the Plan Administrator.

### 7.6.4    De Minimis Distributions

Notwithstanding any other provision of the Plan, Distributions of less than $25.00 need not be made on account of any Allowed Claim; provided that Distributions that would otherwise be made but for this provision shall carry over until the next Distribution date until the cumulative amount to which any holder of an Allowed Claim is entitled to more than $25.00, at which time the cumulative amount of such Distributions will be paid to such holder.

### 7.6.5    Withholding Taxes

Pursuant to Section 346(f) of the Code, the Plan Administrator shall be entitled to deduct any applicable federal, state, or local withholding taxes from any cash payments made with respect to Allowed Claims, as appropriate.  The Plan Administrator shall be permitted to withhold a Distribution to any Creditor that has not provided information requested by the Plan Administrator for the purpose of fulfilling its obligations hereunder.  The Plan Administrator shall

comply with all reporting obligations imposed by any Governmental Unit with respect to withholding and related taxes. This Section is not a surcharge of the collateral of the Secured Creditor and is not a basis for the Plan Administrator to surcharge any collateral of the Secured Creditor.

### 7.6.6    Unclaimed Distributions

Any cash Distributions that remain unclaimed or unnegotiated for one hundred twenty (120) days following Distribution or are returned for reasons other than the absence of a current or correct address (unless a current or correct address cannot be determined after reasonable inquiry) shall become the Property of the Estate and distributed in accordance with this Section 7.6.

### 7.6.7    Disputed Claim Reserve

The Plan Administrator will create a Plan Account for use as a reserve for Disputed Claims. Each time the Plan Administrator makes a Distribution to the holders of Allowed Claims (other than Allowed Secured Claims), the Plan Administrator will deposit into a reserve the aggregate Pro Rata amount that would have been distributed to the holders of Disputed Claims. If a Disputed Claim becomes an Allowed Claim, the Plan Administrator shall promptly distribute to the Creditor from the reserve an amount equal to all Pro Rata Distributions that would have otherwise been due to such Creditor to date under the Plan, calculated using the amount of such Creditor's Allowed Claim. Any funds no longer needed in reserve shall be distributed in accordance with this Section 7.6.

### 7.6.8   Insurance Policies

To the extent any insurance policies exist in which the Debtor or the Estate have an insurable or other interest in or right to make a claim, such policies shall remain available before and after the Effective Date, in addition to covering the Plan Administrator, and its Post-Confirmation Professionals, as applicable, on and after the Effective Date, to satisfy any and all Claims held by, or asserted against, the Estate, the Debtor, the Plan Administrator, or the Plan Administrator's Post-Confirmation Professionals.

### 7.7    Execution and Delivery of Documents

The Plan Administrator is authorized to execute and deliver, in its own name or in the name of the Debtor, such agreements, instruments, and documents as are necessary or appropriate to promote and implement the Plan or to carry out the purposes of the Plan.  Mr. Supor is authorized to execute and deliver, in his own name as holder of the Equity Interests of the Debtor or in the name of the Debtor, such agreements, instruments, and documents as are necessary or appropriate to promote and implement an Exit Transaction to the extent set forth in the Plan.

**7.8    Objections to Claims and Estimation of Claims**

Subject to Section 7.3.3 of this Plan, any objection to Disputed Claims by the Plan Administrator, the Secured Creditor, the Debtor, Mr. Supor, or other parties in interest must be filed before the date that is six (6) months following the Effective Date, unless such period is extended by the Bankruptcy Court for cause shown on motion filed within such original or extended objection period.   Any and all objections to Disputed Claims pending as of the Confirmation Date and not resolved by this Plan or by other order of the Bankruptcy Court are specifically reserved by the Plan and shall not be barred by any theory of *res judicata* solely by Confirmation of the Plan.

**7.9    Claim Bar Dates**

The last day for filing proofs of Claim in the Case shall be the Bar Date fixed by the Bankruptcy Court before Confirmation of the Plan, except for Administrative Claims and Rejection Claims.  The deadline for filing and serving requests for the allowance of Administrative Claims (other than Professional Fees and U.S. Trustee Fees) shall be the Administrative Claim Bar Date.  The deadline for filing proofs of Rejection Claims in the Case shall be the Rejection Claim Bar Date.

**7.10    Jurisdictional Limitations on Claims re: Plan Implementation**

All Claims related to the post-Confirmation conduct of the Plan Administrator or the Post-Confirmation Professionals of the Plan Administrator must be filed in and determined by the Bankruptcy Court.  No concurrent jurisdiction shall exist for the determination or enforcement of any such Claims.

### 7.11    Court and United States Trustee Fees; Post-Confirmation Reports; Final Decree

#### 7.11.1  Accrued U.S. Trustee Fees Paid at Confirmation

On or before the Effective Date, all fees due to the Clerk of the Court and all U.S. Trustee Fees shall be paid in full from the proceeds of, first, Property of the Estate and, thereafter only if necessary, Plan Funding Advances.

#### 7.11.2  Post-Confirmation U.S. Trustee Fees Paid Quarterly

Quarterly U.S. Trustee Fees shall be paid by the Plan Administrator as Plan Expenses for each calendar quarter (including, without limitation, any fraction thereof) until the Case is closed by entry of a Final Decree, converted, or dismissed.  Upon the closing of the Case, no further U.S. Trustee Fees shall be due, except for any calendar quarter (including, without limitation, any fraction thereof) during which the Case may be reopened.

#### 7.11.3  Post-Confirmation Quarterly Reports

Following the Effective Date, the Plan Administrator shall prepare and submit to the Bankruptcy Court and the Office of the United States Trustee, post-Confirmation reports in the form suggested by the Office of the United States Trustee, the purpose of which is to explain the progress made toward full administration of the confirmed Plan.  The first post-Confirmation report shall be due within thirty (30) days following the end of the first calendar quarter from the Effective Date and shall be filed on a quarterly basis thereafter within thirty (30) days after the end of each calendar quarter, unless otherwise agreed to by the Office of the United States Trustee, until the Case is closed by entry of a Final Decree, converted, or dismissed.

#### 7.11.4  Content of Post-Confirmation Quarterly Reports

The aforementioned post-Confirmation reports shall include a statement of receipts and disbursements from the Plan Assets, the Proceeds, and the Plan Funding Advances, with the ending cash balances of the Plan Accounts, for the entire quarter.  The post-Confirmation reports shall also include information sufficiently comprehensive to enable the Bankruptcy Court to determine: (1) whether the Confirmation Order is final; (2) whether deposits required by the Plan,

if any, have been made and distributed; (3) whether property to be transferred under the Plan, if any, has been transferred; (4) whether the Plan Administrator has assumed management of the Plan Assets; (5) whether Disbursements have commenced; (6) whether quarterly U.S. Trustee Fees due to the United States Trustee have been paid; and (7) whether all motions, contested matters, and adversary proceedings have been finally resolved.

### 7.11.5  Service of Post-Confirmation Quarterly Reports

A copy of each aforementioned post-Confirmation report shall be served upon each Person on the Post-Confirmation Service List.

### 7.11.6  Final Decree

After the Plan and the Estate is fully administered, the Plan Administrator shall file an application for a Final Decree, and serve the application on the United States Trustee, together with a proposed Final Decree.  The United States Trustee shall have fourteen (14) calendar days to object to the Bankruptcy Court's entry of the Final Decree.

### 7.12    Conditions Precedent; Notice of Effective Date

Confirmation of this Plan is conditioned upon entry of a Confirmation Order in form and substance acceptable to the Plan Proponents.  Upon satisfaction of such condition, on the Effective Date, the Plan Proponents shall have the power and authority to file a notice of effective date with the Bankruptcy Court.

### ARTICLE VIII
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    All Executory Contracts and Leases Expressly Rejected

All Executory Contracts are expressly rejected upon Confirmation of this Plan.  Among the rejected Executory Contracts are all Leases, other than the Specified Leases.  The Specified Leases may only be assumed by the Debtor in connection with the consummation of a Qualifying Exit Transaction on or before the Exit Transaction Deadline, effective only as of the Exit Transaction Closing Date.  In the absence of such an assumption, any rejection of the Specified

Leases is set forth in Section 8.2 below.  Rejection Claims must be filed with the Bankruptcy Court no later than the Rejection Claim Bar Date.  Failure to timely file Rejection Claims shall result in their disallowance without notice or order of the Bankruptcy Court.  Allowed Rejection Claims shall be paid as Class 3 Claims or Class 4 Claims, as applicable.

**8.2    Transfer of Custody, Possession, and Control of Bergen Avenue**

**8.2.1 Transfer Requirement – Generally**

The following paragraph is referred to hereinafter collectively as the "Transfer Requirement" and with respect to only the Supor Op Co Tenants is subject to Section 8.2.2. By no later than the Effective Date, excluding only those Tenants under valid Leases existing as of the Effective Date who are entitled to make, and have made, an election to retain rights under Section 365(h)(1)(A)(ii) of the Bankruptcy Code and who have performed all of their obligations, including, without payment obligations, under such Leases, all Tenants and any other Third Parties in custody, possession, control, or occupancy of Bergen Avenue shall quit and surrender vacant Bergen Avenue and transfer exclusive custody, possession, and control of Bergen Avenue to the Plan Administrator, on behalf of the Debtor.  By no later than the Effective Date, while under the supervision of the Plan Administrator or its Post-Confirmation Professionals, all Tenants and other Third Parties shall remove their property, and only their property, from Bergen Avenue at their sole cost and expense (and any removal of Property of the Estate from Bergen Avenue by any such Person shall be deemed a willful violation of this Plan).  After the Effective Date upon the written request of the Plan Administrator, any Tenants or other Third Parties formerly in custody, possession, control, or occupancy of Bergen Avenue shall remove any of their property that nevertheless remains at Bergen Avenue at their sole cost and expense.  If any such Person fails to do so, such property shall be deemed abandoned and, at the option of the Plan Administrator, may remain in place, be removed, become part of the Plan Assets, or be otherwise disposed of by the Plan Administrator at the sole cost and expense of such Person.  The Plan Administrator shall have the right, power, and authority to seek further relief from the Bankruptcy Court and any other court to enforce, and compel the compliance of any Person with, the provisions of this Section,

including, without limitation, the right, power, and authority to bring actions to obtain judgments for possession and warrants of removal in respect of Bergen Avenue and, in connection therewith, relief from any applicable stay.

### 8.2.2 Transfer Requirement – Supor Entities

Notwithstanding the deadline for compliance with the Transfer Requirement of the Effective Date, the Supor Entities shall have until the Qualifying Bid Deadline to either (a) comply with the Transfer Requirement (with the Qualifying Bid Deadline taking the place of the Effective Date throughout the Transfer Requirement) or (b) have the Debtor and/or Mr. Supor submit a Qualifying Bid.  If, on or before the Qualifying Bid Deadline, the Debtor and/or Mr. Supor have submitted a Qualifying Bid, then the Supor Entities shall have until the Exit Transaction Deadline to either (a) comply with the Transfer Requirement (with the Exit Transaction Deadline taking the place of the Effective Date throughout the Transfer Requirement) or (b) have the Debtor and/or Mr. Supor consummate a Qualifying Exit Transaction. Upon consummation of a Qualifying Exit Transaction on or before the Exit Transaction Deadline, the Supor Entities shall no longer have an obligation to comply with the Transfer Requirement.  Notwithstanding the foregoing, in the event that the Supor Op Co Tenants fail to timely make any Rent Payment, as and when due and payable under this Plan, the deadline for the Supor Entities' compliance with the Transfer Requirement shall be the Termination Date.

To further memorialize and enforce the foregoing, the Supor Entities have agreed to a consent order with the Chapter 11 Trustee and/or the Plan Administrator, providing for the eviction of the Supor Entities from Bergen Avenue but staying the scheduling of any such eviction to until after the Termination Date (the "Consent Order").  The Consent Order shall be submitted to the Bankruptcy Court with the Confirmation Order and made part thereof.  Entry of the Consent Order by the Bankruptcy Court is a condition of Confirmation of this Plan.  Upon consummation of a Qualifying Exit Transaction on or before the Exit Transaction Deadline, the Consent Order shall be terminated and the agreements set forth therein shall be deemed null and void without the requirement of further action.  If, by the applicable deadline, the Supor Entities have not fully

complied with the Transfer Requirement, then, in addition and without limitation to any other rights and remedies the Plan Administrator may have under this Plan, at law, and in equity, the Plan Administrator may proceed to schedule the eviction of the Supor Entities from Bergen Avenue pursuant to the Consent Order; provided, however, that, if a Bid Determination Motion has been filed by the Debtor and/or Mr. Supor in accordance with the term, conditions, and provisions of Section 7.3.12(a), the Plan Administrator shall be stayed from any such enforcement of pending entry of an order of the Bankruptcy Court resolving such Bid Determination Motion.

In the event that any Supor Entity files, or has filed against it, a petition for relief under the Bankruptcy Code, no Supor Entity shall oppose, and each Supor Entity hereby consents to, the immediate grant of relief from the automatic stay in favor of the Debtor and the Plan Administrator in any such bankruptcy case in order to allow for the enforcement of the Consent Order and the terms, conditions, and provisions of this Plan by the Debtor and the Plan Administrator. The foregoing shall not be construed as creating a requirement for the Debtor and the Plan Administrator to obtain relief from the automatic stay in any such bankruptcy case if no such requirement otherwise exists under applicable bankruptcy law.

### 8.2.3 Rent Payments

Commencing on February 1, 2024 and continuing on the same day of each calendar month thereafter through, but excluding, the Termination Date, the Supor Op Co Tenants shall make Rent Payments to the Plan Administrator. The Plan Administrator shall turnover the Designated Rent Payments to the Secured Creditor on account of the Secured Creditor's Allowed Secured Claim as provided for in Section 6.2. The Plan Administrator may use the proceeds of other Rent Payments for the same purposes which Plan Funding Advances may be used. In the event that the Supor Op Co Tenants fail to timely make any Rent Payment, as and when due and payable under this Plan, notwithstanding anything to the contrary contained in this Plan, (a) the Termination Date shall immediately and automatically occur without the need of any notice or other action by any Person whatsoever; (b) the Plan Administrator may proceed to schedule the eviction of the Supor Entities from Bergen Avenue pursuant to the Consent Order; and (c) the Plan

Administrator shall have the exclusive right to market and pursue a sale or other transaction with respect to the Plan Assets.

### 8.2.4    Acknowledgements and Agreements of Supor Entities

The Supor Entities acknowledge and agree that (a) to the extent any Supor Entity ever had a valid Lease of premises at Bergen Avenue, other than a Specified Lease, such Lease was terminated prior to Confirmation in accordance with its terms, conditions, and provisions; (b) each Specified Lease shall automatically and immediately, without the need of any further notice or other action by any Person whatsoever, terminate in accordance with its terms, conditions, and provisions, pursuant to the termination notices sent by the Chapter 11 Trustee, effective as of the Termination Date; (c) effective as of the Termination Date, no Supor Entity will have a valid Lease of premises at Bergen Avenue; (d) in addition, in an abundance of caution and only to the extent not already terminated, each Specified Lease will be rejected under the Plan effective as of the Termination Date; (e) as of the Termination Date, no Supor Entity will be entitled to make an election to retain rights under Section 365(h)(1)(A)(ii) of the Bankruptcy Code; (f) in addition, in an abundance of caution, effective as of the Effective Date, all Supor Entities irrevocably and unconditionally waive any and all rights they may have under Sections 108 and 365(h)(1)(A)(ii) of the Bankruptcy Code with respect to the termination and/or rejection of any Lease of premises at Bergen Avenue occurring as of the Termination Date; and (g) each Supor Entity consents to, and agrees to be bound by, all of the terms, conditions, and provisions of the Plan, the Confirmation of the Plan, and the Confirmation Order.

**ARTICLE IX**
**POST-CONFIRMATION EMPLOYMENT AND COMPENSATION OF**
**PROFESSIONALS**

After the Effective Date, the Plan Administrator may employ, without notice, hearing, or order of the Bankruptcy Court, Post-Confirmation Professionals.  Any and all Post-Confirmation Professionals of the Plan Administrator shall be employed by the Plan Administrator, in its capacity as such, pursuant to this Plan, in its discretion, and shall not be subject to retention by the

Bankruptcy Court or the retention and fee application process, provided under, *inter alia*, Sections 327 and 331 of the Code and applicable law.  For periods on or after the Effective Date, the Plan Administrator shall file a monthly compensation report detailing total compensation and expense reimbursements to be paid to each of the Post-Confirmation Professionals for the prior month; provided, however, that the report shall not include detailed time records for the Post-Confirmation Professionals.  Parties in interest shall have five (5) Business Days after the filing of any monthly compensation report to object to the same.  Absent any such objection, all compensation and expense reimbursements owed to the Post-Confirmation Professionals as set forth on such monthly compensation report shall constitute Plan Expenses and shall be paid by the Plan Administrator in accordance with the terms and conditions of the Plan, without further notice or order of the Bankruptcy Court.  In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Post-Confirmation Professional with respect to such monthly compensation report.  For purposes of any such determination, the standard for approval and payment shall be whether such request is reasonable under the circumstances.

## ARTICLE X

## MODIFICATION OF PLAN

### 10.1     Pre-Confirmation Modification

Pursuant to Section 1127(a) of the Code, the Plan may be modified upon motion of the Plan Proponents or corrected by the Plan Proponents before the Effective Date, without notice and a hearing and without additional disclosure pursuant to Section 1125 of the Code, provided that, after notice to the United States Trustee and all parties that have filed and served a request for special notice in the Case, the Bankruptcy Court finds that such modification does not materially or adversely affect any Creditor or any Class of Creditors.

### 10.2     Post-Confirmation Immaterial Modification

At any time before thirty (30) calendar days after the Effective Date, the Plan Administrator, after consultation with the Plan Proponents, may seek Bankruptcy Court authorization to remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order, or effect such other changes, modifications, or amendments as may be necessary to carry out the purposes and intent of the Plan, provided the Bankruptcy Court finds that such changes, modifications, or amendments do not materially or adversely affect any Creditor or any Class of Creditors.

**10.3    Post-Confirmation Material Modification**

The Plan may be modified at any time after Confirmation, pursuant to Section 1127(b) or (e) of the Code, by the Plan Administrator, after consultation with the Plan Proponents.

**ARTICLE XI**
**EFFECT OF CONFIRMATION**

**11.1    Binding on Parties-in-Interest**

The confirmed Plan is binding on every Creditor whose Claim is provided for in the Plan and all holders of Equity Interests in the Debtor.

**11.2    Obligations to Each Class Separate**

Obligations under this Plan are separate with respect to each Class of Creditors and holders of Equity Interests in the Debtor.  Default in performance of an obligation due to members of one Class shall not by itself constitute a default with respect to members of other Classes.  For purposes of this Article, the holders of all Administrative Claims shall be considered to be a single Class, and each Third Party to an Executory Contract shall be considered to be a separate Class.

**11.3    Effect of Conversion to Chapter 7**

If the Case is at any time converted to one under chapter 7 of the Code, all property of the Debtor shall vest in the chapter 7 bankruptcy estate to the same extent provided for in Section 348 of the Code upon conversion.

**11.4    Injunction**

**11.4.1 Except as otherwise expressly provided in this Plan or in the Confirmation Order, and except in connection with the enforcement of the terms of this Plan or the Confirmation Order or any agreements, instruments, or documents provided for or contemplated in this Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor or the Estate that arose prior to the Effective Date are permanently enjoined from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the Estate, the Plan Assets, the Proceeds, or any property of the Debtor with respect to any such Claim or Equity Interest; (ii) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the Estate, the Plan Assets, the Proceeds, or any property of the Debtor with respect to any such Claim or Equity Interest; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against the Debtor, the Estate, the Plan Assets, the Proceeds, or any property of the Debtor with respect to any such Claim or Interest; (iv) effecting, directly or indirectly, any setoff or recoupment of any kind against any obligation due to the Debtor, the Estate, the Plan Assets, the Proceeds, or any property of the Debtor with respect to any such Claim or Equity Interest; and (v) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan and the Confirmation Order with respect to such Claim or Equity Interest.**

**11.4.2 Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Bankruptcy Case under Bankruptcy Code §§ 105 or 362, this Plan, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the entry of the Final Decree.**

**11.5    Release of Secured Creditor**

**Effective as of the Effective Date, for good and valuable consideration, including, without limitation, the agreement in favor of the Supor Entities set forth in Section 8.2 and the Plan Funding Advances to facilitate the implementation of this Plan and the expeditious**

**liquidation of the Plan Assets, the Debtor and the Estate shall be deemed to have unconditionally released the Secured Creditor and the partners and employees of Reed Smith LLP from any and all Claims, obligations, rights, suits, remedies, liabilities, crossclaims, counterclaims, debts, obligations, damages, losses, fees, defenses, remedies, setoff, recoupment or other offset rights, and other rights of disgorgement or recovery, whatsoever, including, without limitation, any Claims that could be asserted by or on behalf of the Debtor or the Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, without limitation, claims concerning the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, and/or the property to be distributed under this Plan), except for cases of gross negligence, willful misconduct, or fraud in each case as determined by Final Order of a court of competent jurisdiction.**

11.6    Discharge and Release of Debtor

(1)    Except for distributions and obligations specifically created or affirmed under the Plan, or as otherwise provided in the Confirmation Order, effective as of the Exit Transaction Closing Date, the Confirmation Order shall operate as a discharge under Section 1141(d)(1) of the Bankruptcy Code and as a release of any and all debts (as such term is defined in Section 101(12) of the Bankruptcy Code) of, and Claims against, the Debtor that arose at any time before the Confirmation Date, including, but not limited to, all principal and interest, whether accrued before, on or after the Petition Date, regardless of whether (i) a Proof of Claim in respect of such Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to Section 502 of the Bankruptcy Court, or (iii) the holder of such Claim has voted on this Plan or has voted to reject

this Plan. Without limiting the generality of the foregoing, effective as of the Exit Transaction Closing Date, the Debtor shall be discharged from any debt that arose before the Confirmation Date and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code and shall have all of the benefits and protections set forth in Section 1141(d)(i) of the Bankruptcy Code. Except as otherwise specifically provided herein, nothing in this Plan shall be deemed to waive, limit or restrict in any manner the discharge granted upon Confirmation of this Plan pursuant to Section 1141 of the Bankruptcy Code.

(2)    The discharge and release of the Debtor as provided in the Plan shall not diminish or impair the enforceability of any insurance policies that may cover claims against any Debtor or any other Person. The discharge and release of the Debtor as provided in this Plan shall not diminish or impair any claims arising after the Confirmation Date with respect to the non-monetary obligations of the Debtor under any insurance policy. The insurers under all policies to which the Debtor is a party will continue to be responsible for insurance claims, including, without limitation, future claims, in accordance with the terms of the insurance policies and the requirements of state and other applicable law, notwithstanding the effect of the discharge and release under this Plan on any requirement under the insurance policies that the Debtor first satisfy any monetary obligations arising prior to the Confirmation Date.

(3)    The rights afforded in the Plan and the treatment of all Claimants shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued thereon, which arose prior to the Confirmation Date, against the Debtor and the Estate, or its assets, properties, or interests in property. Except as otherwise provided in the Plan, effective as of the Exit Transaction Closing Date, all Claims and demands against the Debtor and the Estate shall be satisfied, discharged, and released in full.

(4)     Effective as of the Exit Transaction Closing Date, the Debtor shall not be responsible for any obligations of the Debtor or the Bankruptcy Estate except those expressly assumed by the Debtor pursuant to the Plan.

(5)     Effective as of the Exit Transaction Closing Date, all Persons and Claimants shall be precluded and forever barred from asserting against the Debtor or its assets, properties, or interests in property any other or further Claims or demands based upon any act or omission, transaction or other activity, event or occurrence of any kind or nature that occurred prior the Confirmation Date, whether or not the facts of the legal basis therefore were known or existed prior to the Confirmation Date, except as expressly provided in the Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code §§ 524(a) and 1141, effective as of the Exit Transaction Closing Date, the discharge of the Debtor operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived; provided, however, that any obligations of the Debtor under this Plan are not so discharged.

(6)     On and after the Exit Transaction Closing Date, the Debtor and its representatives shall be fully and finally discharged of any liability or obligation on any Claim that is not an Allowed Claim and any order creating a Claim that is not an Allowed Claim that is not a Final Order as of the Exit Transaction Closing Date solely because of a Claimant's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Exit Transaction Closing Date.

**11.7    Release of Joseph Supor, III**

**Effective as of the Exit Transaction Closing Date, for good and valuable consideration, including, without limitation, procuring the Qualifying Bid resulting in the consummation of the Exit Transaction, the Debtor and the Estate shall be deemed to have unconditionally released Joseph Supor, III and the partners and employees of K&L Gates LLP and Forman Holt from any and all Claims, obligations, rights, suits, remedies, liabilities, crossclaims, counterclaims, debts, obligations, damages, losses, fees, defenses, remedies, setoff, recoupment or other offset rights, and other rights of disgorgement or recovery, whatsoever, including, without limitation, any Claims that could be asserted by or on behalf of the Debtor or the Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, without limitation, claims concerning the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, and/or the property to be distributed under this Plan), except for cases of gross negligence, willful misconduct, or fraud in each case as determined by Final Order of a court of competent jurisdiction.**

**11.8    Mutual Release Upon Repayment in Full of Allowed Claim of Secured Creditor**

**11.8.1  Release of Secured Creditor**

**Effective as of the date on which the Allowed Claim of Secured Creditor has been paid in full in immediately available funds, for good and valuable consideration, Mr. Supor and the Marital Trust shall be deemed to have unconditionally released the Secured**

Creditor and the partners and employees of Reed Smith LLP from any and all Claims, obligations, rights, suits, remedies, liabilities, crossclaims, counterclaims, debts, obligations, damages, losses, fees, defenses, remedies, setoff, recoupment or other offset rights, and other rights of disgorgement or recovery, whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that Mr. Supor and/or the Marital Trust would have been legally entitled to assert in their own right, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before such date (including, without limitation, claims concerning the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, and/or the property to be distributed under this Plan).

### 11.8.2 Release of Mr. Supor and Marital Trust

Effective as of the date on which the Allowed Claim of Secured Creditor has been paid in full in immediately available funds, for good and valuable consideration, Secured Creditor shall be deemed to have unconditionally released Joseph Supor, III, the Marital Trust, and the partners and employees of K&L Gates LLP and Forman Holt from any and all Claims, obligations, rights, suits, remedies, liabilities, crossclaims, counterclaims, debts, obligations, damages, losses, fees, defenses, remedies, setoff, recoupment or other offset rights, and other rights of disgorgement or recovery, whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that Secured Creditor would have been legally entitled to assert in their own right, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before such date (including, without limitation, claims concerning the

**formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, and/or the property to be distributed under this Plan).**

**ARTICLE XII
GENERAL PROVISIONS**

**12.1    Jurisdiction**

After Confirmation of this Plan, the Bankruptcy Court shall retain jurisdiction to the fullest extent legally permissible for all purposes consistent with the Plan and the Code, which purposes include, but are not limited to (and which are in addition to all other purposes identified in the other provisions of the Plan):

**12.1.1** The classification or allowance of a Claim of any Creditor and the reexamination of Claims which have been temporarily allowed for purposes of voting and the determination of such objections as may be filed against Creditors' Claims;

**12.1.2** The determination of all questions and disputes regarding title to the Property of the Estate, and the determination of all causes of action, controversies, disputes, or conflicts, including the right to participate in any Distribution from the Estate, whether or not subject to an action pending as of the Effective Date, between the Plan Administrator and any other Person, including, but not limited to, any right of the Plan Administrator to recover assets pursuant to the provisions of the Code;

**12.1.3** The correction of any defect, curing of any omission, or the reconciliation of any inconsistency in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

**12.1.4** The determination of the allowability, validity, and priority of Claims against the Estate, whether such Claims are asserted before or after the Effective Date;

**12.1.5** The modification or amendment of the Plan after Confirmation pursuant to the Bankruptcy Rules or the Code and the other terms and conditions of this Plan;

**12.1.6** The enforcement and interpretation of the terms and provisions of the Plan, the Secured Creditor Loan Documents, or the Confirmation Order;

**12.1.7** The entry of any order concluding or terminating the Case; or

**12.1.8** The administration of the Case and implementation and consummation of the Plan.

**12.2    Interpretation**

To the extent that the terms of the Plan are inconsistent with the terms of any agreement or instrument concerning any Claim or Equity Interest in the Debtor, or any other matter, the terms of the Plan shall control.

**12.3    Binding Effect**

Upon Confirmation of the Plan, the Debtor, the Plan Administrator, all Creditors, all Tenants, and all holders of Equity Interests, whether or not the Claim of such Creditor is impaired under the Plan and whether or not such Creditor or Equity Interest holder has accepted the Plan, shall be bound by the provisions of the Plan pursuant to Section 1141(a) of the Code.

**12.4    Applicable Law**

The Plan is to be governed by and construed under the Code and the laws of the State of New Jersey as they may be applicable.

**12.5    Severability**

If any provision in the Plan is determined to be unenforceable by the Bankruptcy Court, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan; and the Bankruptcy Court shall have the power to alter and interpret such provision to make it valid and enforceable to the maximum extent practicable, consistent with the original purpose of the provision, and such provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that each provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.6    Implementation Orders**

At any time, the Bankruptcy Court may make such orders or give such direction as may be appropriate under Section 1142 of the Code.

**12.7    Notices**

Any notice to the Plan Administrator shall be in writing, and will be deemed to have been given five (5) days after the date sent by first-class mail, postage prepaid and addressed as follows:

> McManimon, Scotland & Baumann, LLC
> 427 Riverview Plaza
> Trenton, NJ 08611
> Attn: Andrea Dobin, Partner
>
> With a Copy To:
>
> McManimon, Scotland & Baumann, LLC
> 427 Riverview Plaza
> Trenton, NJ 08611
> Attn: Michele M. Dudas, Partner

**12.8    Rules of Construction**

The rules of construction provided in Section 102 of the Code shall apply to the words and phrases of this Plan.  Headings and captions are utilized in this Plan for convenient reference only and shall not constitute a part of this Plan for any other purpose.

**12.9    Exhibits**

All exhibits attached to this Plan are, by this reference, hereby incorporated into the Plan.

**12.10    Exemption from Transfer Taxes**

Pursuant to Section 1146(a) of the Code, the issuance, transfer, or exchange of notes or issuance of debt or equity securities under this Plan, the creation of any mortgage, deed of trust, or other security interest, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including, without limitation, pursuant to an Exit Transaction, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, or other similar tax, irrespective of whether the underlying property is owned by the Debtor a Third Party.  All transactions specifically provided for by the Plan, including but not limited to sale(s) of Plan Assets administered by the Plan Administrator, shall be deemed to have been made

under, in furtherance of, or in connection with the Plan and, therefore, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, or other similar tax.

Respectfully submitted,

**BEB BERGEN AVE, LLC**,
a New York limited liability company

By: *s/Keyvan Ghaytanchi*
Name:  Keyvan Ghaytanchi
Title:   Authorized Signatory

**SUPOR PROPERTIES BERGEN AVENUE LLC**

*s/Joseph Supor III*
Joseph Supor III – Sole Member

**JOSEPH SUPOR, III**

*s/Joseph Supor III*
Joseph Supor III, individually

Dated: January 29, 2024

Exhibit "1"

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Kearny, in the County of Hudson, State of New Jersey:

Parcel A:

BEGINNING at a point in the easterly line of Bergen Avenue, (60' wide), said point being northerly and distant 565.42 feet (566.39 feet per Deed) from a point formed by the intersection of the said easterly sideline of Bergen Avenue with the northerly sideline of Harrison Avenue (a/k/a Newark and Jersey City Turnpike) (66' wide), and from said point proceeding thence;

(1)      North 6 degrees 45 minutes 00 seconds West, along said easterly sideline of Bergen Avenue, for a distance of 130.64 feet (130.63 feet per Deed) to a point; THENCE

(2)      North 75 degrees 31 minutes 00 seconds East,  departing from said easterly sideline of Bergen Avenue, for a distance of 902.82 feet to a point; THENCE

(3)      South 10 degrees 14 minutes 00 seconds East, for a distance of 456.03 feet to a point; THENCE

(4)      North 84 degrees 20 minutes 00 seconds West, for a distance of 944.40 feet (944.41 feet per Deed) to a point in the aforementioned easterly sideline of Bergen Avenue, said point also being the point or place of BEGINNING.

Being known as tax lot 5, in tax block 286 on the official tax map of the Town of Kearny, Hudson County, State of NJ.


Parcel B:

BEGINNING at a point in the easterly line of Bergen Avenue at a point therein distant northerly 498.73 feet (498.81 feet per Deed) from the northerly line of Harrison Avenue a/k/a Newark and Jersey City Turnpike, which point is also the point of intersection of the southerly line of now or formerly Erie Railroad-Old Newark Branch and the easterly line of Bergen Avenue; thence running

(1)      Along said line of Bergen Avenue, North 6 degrees 45 minutes 00 seconds West, 67.59 feet to a point in the northerly line of the now or formerly Erie Railroad-Old Newark Branch; THENCE

(2)      Along the said northerly line of Erie Railroad-Old Newark Branch, on a course of South 84 degrees 20 minutes 00 seconds East, a distance of 1581.06 feet to a point; THENCE

(3)      South 35 degrees 36 minutes 8 seconds West, 259.63 feet to a point; THENCE

(4)      South 5 degrees 58 minutes 20 seconds West, 119.83 feet to a point; THENCE

(5)      South 88 degrees 2 minutes 00 seconds West, 308.33 feet to a point; THENCE

(6)      North 10 degrees 14 minutes 00 seconds West, 260.95 feet to a point in the southerly line of now or formerly Erie Railroad-Old Newark Branch; THENCE

7)      Along said line, North 84 degrees 20 minutes 00 seconds West, 948.62 feet to the easterly line of Bergen Avenue and the point and place of BEGINNING.


The above premises being further described in accordance with Survey prepared by Lapatka Associates, Inc. dated July 3, 2021 as follows:

BEGINNING at a point in the easterly sideline of Bergen Avenue (60' wide), said point being northerly and distant 497.83 feet form a point formed by the intersection of the said easterly sideline of Bergen Avenue with the northerly sideline of Harrison Avenue, (a/k/a Newark and Jersey City Turnpike) (66' wide), and from said point proceeding; thence

(1)      North 6 degrees 45 minutes 00 seconds West, along said easterly sideline of Bergen Avenue, for a distance of 67.58 feet to a point; THENCE

(2)      South 84 degrees 20 minutes 00 seconds East, departing from said easterly sideline of Bergen Avenue, for a distance of 1585.70 feet to a point in the westerly sideline of New Jersey Turnpike Ramp "R"; THENCE

(3)      South 35 degrees 36 minutes 9 seconds West, along said ramp, for a distance of 76.16 feet to a point; THENCE

(4)      North 4 degrees 20 minutes 00 seconds West, still along said ramp, for a distance of 5.40 feet to a point; THENCE

(5)      South 35 degrees 36 minutes 9 seconds West, still along said ramp, for a distance of 182.46 feet to a point in the aforementioned northerly sideline of Harrison Avenue; THENCE

(6)      South 75 degrees 58 minutes 20 seconds West, along said northerly sideline of Harrison Avenue, for a distance of 119.83 feet to a point; THENCE

(7)      South 86 degrees 2 minutes 00 seconds West, departing from said northerly sideline of Harrison Avenue, for a distance of 308.33 feet to a point; THENCE

(8)      North 10 degrees 14 minutes 00 seconds West, for a distance of 260.05 feet to a point; THENCE

(9)      North 84 degrees 20 minutes 00 seconds West, for a distance of 948.67 feet to a point in the aforementioned easterly sideline of Bergen Avenue, said point also being the point and place of BEGINNING.

Being known as tax lot 6.01 (formerly Lots 6A & 9) in tax block 286 on the official tax map of the Town of Kearny, Hudson County, State of NJ.

The above premises being further described in accordance with Survey prepared by Lapatka Associates, Inc. dated July 3, 2021 as follows:

BEGINNING at a point in the easterly sideline of Bergen Avenue (60' wide), said point being northerly and distant 497.83 feet from a point formed by the intersection of the said easterly sideline of Bergen Avenue with the northerly sideline of Harrison Avenue, (a/k/a Newark and Jersey City Turnpike) (66' wide), and from said point proceeding; thence

(1)      Along said easterly line of Bergen Avenue, North 6 degrees 45 minutes 00 seconds West 198.22 feet to a point; THENCE

(2)      North 75 degrees 31 minutes 00 seconds East 902.82 feet to a point; THENCE

(3)      South 10 degrees 14 minutes 00 seconds East 456.03 feet to a point; THENCE

(4)      South 84 degrees 20 minutes 00 seconds East 641.30 feet to a point in the westerly lien of the N.J. Turnpike ramp; thence

(5)      South 35 degrees 36 minutes 9 seconds West, 76.16 feet to a point; THENCE

(6)      North 84 degrees 20 minutes 00 seconds West, still along said ramp. for a distance of 5.40 feet to a point; THENCE

(7) South 35 degrees 36 minutes 9 seconds West, still along said ramp for a distance of 182.46 feet to a point in the aforementioned northerly sideline of Harrison Avenue; THENCE

(8) South 75 degrees 58 minutes 20 seconds West, along said northerly sideline of Harrison Avenue, for a distance of 119.83 feet to a point; THENCE

(9) South 86 degrees 2 minutes 00 seconds West, along said northerly sideline of Harrison Avenue, for a distance of 308.33 feet to a point; THENCE

(10)      North 10 degrees 14 minutes 00 seconds West, for a distance of 260.05 feet to a point; THENCE

(11)      North 84 degrees 20 minutes 00 seconds West 948.67 feet to the easterly line of Bergen Avenue and the point and place of BEGINNING.


Being known as tax lot 5, 6.01 & 9 HM in tax block 286 on the official tax map of the Town of Kearny, Hudson County, State of NJ.

Exhibit "2"

The Plan Administrator will be compensated based upon the gross consideration provided for "Bergen Avenue" in any transaction pursuant to the Plan.  She will receive a payment equal to two percent (2%) of the gross consideration provided in any such transaction, without consideration of any credits, adjustments or payments made at the time of closing.

All payments will be due and payable from the proceeds of the closing at the time of distribution to creditors.

In addition to the commission payment, the Plan Administrator is entitled to reimbursement of her actual out of pocket expenses.